COLORADO ENVIRONMENTS, INC., NOW KNOWN AS BILBRAY INDUSTRIES, A NEVADA CORPORATION, APPELLANT, v. VALLEY GRADING CORPORATION, RESPONDENT.

No. 18933

August 23, 1989                                    779 P.2d 80

*Beckley, Singleton, DeLanoy, Jemison & List* and *Franny A. Forsman,* Las Vegas, for Appellant.

*Jimmerson & Davis,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

On February 28, 1983, appellant Colorado Environments, Inc., now known as Bilbray Industries (CEI), entered into a contract with respondent Valley Grading Corporation (Valley). Pursuant to the terms of the contract Valley was to construct certain on-site and off-site improvements, including two flood retention dams, in a proposed subdivision CEI was preparing to develop in Laughlin. The contract was silent as to the date on which construction was to begin, and CEI did not expressly condition its performance upon obtaining the permits necessary

to commence the project. When the parties executed the contract, CEI informed Valley that the subdivision's plans were in the final approval stage with Clark County's Public Works Department (Public Works) and that construction would commence within two weeks.

Contrary to what CEI had indicated, work on the subdivision did not begin within two weeks. Public Works withheld its final approval of the subdivision plans when concerns arose over CEI's proposed use of "earth-filled" or pervious core dams, rather than impervious core dams as CEI indicated in its initial flood control study. By early April, 1983, CEI decided to abandon the flood retention dam concept and opted for an armored drainage channel instead. On April 12, 1983, CEI and Valley executed a second contract in which Valley agreed to construct the drainage channel. The total price for the two contracts was $1,593,670.

In the interim between Spring and Fall of 1983, Valley bid and performed other projects with CEI's approval. In September, 1983, CEI informed Valley that construction on the Laughlin subdivision would begin October 1, 1983. Thereafter, CEI again revised the commencement date to November 1, 1983. On October 24, 1983, Valley, apparently fearing yet another postponement, wrote to CEI and demanded that work commence within fifteen days, or that the contracts be cancelled and it receive 20 percent of the contract price as damages. CEI did not respond to the demand in writing, but, sometime after November 1, 1983, CEI's president, Robert Bilbray, informed Valley that he was accepting bids from other contractors to perform the work. In a letter dated November 16, 1983, Valley expressed its continued willingness to perform the two contracts and characterized CEI's "bid shopping" as unethical.

CEI again contacted Valley about performing the Laughlin contracts in April, 1984. The possibility of Valley performing the work ended, however, when Valley refused to reduce its contract price by $100,000 as Bilbray demanded. Valley brought the suit that is the subject of this appeal in mid-June, 1984. Thereafter, CEI awarded the construction contracts to another company who commenced work in December, 1984. Following trial on Valley's breach of contract action, a jury found in Valley's favor and awarded it compensatory damages in the amount of $1,035,600. The jury's award included damages for lost profits ($521,449) and standby equipment or delay damages ($514,151).[1] This appeal ensued.

---

[1]Although the jury in returning its damage award did not specify the amounts it awarded for lost profit and equipment standby damages, its award coincided precisely with the damage analysis presented by Valley's expert witness. *See infra.*

At trial, CEI contended, among other things, that governmental interference prevented it from performing its contracts with Valley and that its performance was contingent upon an implied condition, *i.e.*, that governmental regulations or orders would not prevent its performance within a reasonable time. CEI therefore offered proposed jury Instruction No. 17. The proposed instruction provided: "An implied condition operates where parties enter into a ocntract [sic] on the assumption that some thing essential to its performance will occur." The district court refused to give the proposed instruction because it believed that the concept of implied conditions was adequately covered in another instruction and that the proposed instruction would confuse the jury. CEI now contends that the district court erred in refusing to give proposed Jury Instruction No. 17. We disagree.

It is a party's right to have the jury instructed on the theories of its case which are supported by the evidence. Beattie v. Thomas, 99 Nev. 579, 583, 668 P.2d 268, 271 (1983). Where other instructions inform the jury of information contained in a proposed instruction, however, the trial court should not give the latter. *Id.* Instruction No. 16, the instruction that the district court gave on contract conditions, provided:

> Performance of a contract may be subject to conditions and performance need not take place until the conditions are fulfilled. Such conditions may be express or implied. By the phrase "express condition" is meant a provision which is specifically agreed to by the parties either orally or in writing. *By the term "implied condition" is meant a term or condition which is recognized by the parties to exist and to bind them in their action despite the fact that it is not expressly spelled out or agreed to by the parties.* Such terms are often said to arise by implication from the terms which were expressly enumerated in the contract and agreed to or from practice with the industry or business within which the proposed contract performance would take place. Nonoccurrence of the condition, express or implied, excuses the parties from performing the contract, unless one of the parties is responsible for that nonoccurrence.

(Emphasis supplied.)

The message conveyed by the above emphasized language in Instruction No. 16 is essentially the same as that contained in CEI's proposed instruction. Instruction No. 16 adequately informed the jury of the concept of implied conditions. There-

fore, the proposed instruction would have been redundant. Moreover, unlike the instruction that the district court gave, the proposed instruction did not fully inform the jury that performance is not excused when a party is responsible for the nonoccurrence of the condition. Thus, and as the district court believed, the proposed instruction could have confused the jury. Accordingly, we believe that the district court did not err in refusing to give proposed jury Instruction No. 17.

CEI also contends that the district court erred by giving Instruction No. 18 which provided:

> A party to a contract may be relieved of his duty to perform under a contract, either temporarily or permanently, when the party's performance is rendered impossible by unforeseen events or occurrences.

> Under Nevada law, one who contracts to render a performance for which government approval is required has the duty of obtaining such approval and the risk of its refusal is on him. Where the requirement of government approval is foreseeable, and is not addressed in the contract, the failure to obtain such approval by the party seeking it does not justify the party's breach of the agreement, or his failure to perform.

> Moreover, where a government regulation does not prohibit performance, but only renders it more costly or difficult to perform, the defense of impossibility of performance does not apply.

Although CEI admits that the requirement of securing the permits to construct was foreseeable, it contends that the second paragraph of the instruction informed the jury that Public Works' refusal to issue the necessary permits provided no excuse or justification for CEI's failure to perform. Therefore, argues CEI, the instruction required the jury to reject CEI's theory of defense. Again, we disagree.

Instruction No. 18, which was based on our decision in Nebaco, Inc. v. Riverview Realty, 87 Nev. 55, 482 P.2d 305 (1971), is a correct statement of the law applicable to this case. *See* Hawkins v. First Fed. Sav. and Loan Ass'n, 820 So.2d 93 (1973); *see also* 6 Corbin, Corbin on Contracts § 1347, at 435 (1962) ("Ordinarily, when one contracts to render a performance for which a governmental license or permit is required it is his duty to get the license or permit so that he can perform. The risk of inability to obtain it is on him; and its refusal by the government is no defense in a suit for breach of his contract.") (Quoted

in *Hawkins,* 280 So.2d at 97.) The first paragraph of Instruction No. 18 clearly informed the jury that if CEI's performance was rendered impossible by unforeseen events or occurrences, then CEI would be relieved, either temporarily or permanently, of its contractual obligations. Thus, the instruction did not *require* the jury to reject CEI's argument that performance of the contract was rendered impossible by unforeseen governmental requirements that CEI did not cause itself. Rather, and contrary to CEI's argument that Instruction No. 18 required the application of a presumption, the instruction required the jury to determine a factual question, *viz.* whether the delay in approval of CEI's plans resulted from unforeseeable events or occurrences. The jury decided this question against CEI. From our review of the record, the jury's deciding as it did is more attributable to the evidence Valley produced at trial than any supposed deficiency in the instruction. Valley produced abundant evidence from which the jury could have found that CEI's own corner and cost cutting measures, as well as its refusal to cooperate with Public Works, caused the delay in the plans' final approval. In our view, Instruction No. 18 did not take from the jury CEI's theory of defense. We conclude therefore that the district court did not err in giving the instruction.

CEI next argues that the evidentiary foundation for the jury's award of "equipment leasing expense (or idle equipment downtime)" was inadequate as a matter of law. In CEI's view, not only did Valley fail to establish the existence of a lease agreement and that Valley either paid for or was indebted on the leased equipment, Valley also failed to prove that the leased equipment was ever "up" on the job. Therefore, according to CEI, the jury's damages award on this claim was improper.

At trial, Valley offered testimony that it entered into an oral agreement with Gilbert Development Corporation (Gilbert) to lease the heavy equipment necessary to perform the CEI contracts. Valley introduced into evidence invoices for the months of December, 1983, through February, 1984, that listed the equipment it leased and the cost thereof. The total lease expense for the three month period that Valley estimated it would take to complete the Laughlin project was $229,680. Further testimony established that both Valley and Gilbert recognized Valley's indebtedness for the leased equipment.

In presenting its damage claim to the jury, Valley offered the testimony of an expert witness who opined that because of CEI's breach Valley not only was entitled to lost profit damages in the amount of $521,449, it was also entitled to equipment standby or delay damages in the amount of $514,151. According to the

expert, the latter damages compensated Valley for the time its leased equipment stood idle and could not be used. CEI presented its own expert who contended that awarding Valley equipment standby damages would constitute a double recovery. The jury, however, accepted the testimony of Valley's expert and awarded Valley both lost profit and equipment standby damages.

We believe that Valley adequately established the evidentiary foundation necessary to support a claim for equipment leasing costs. The evidence Valley offered was sufficient to prove the existence of a binding oral lease agreement the terms of which the jury could have inferred from the invoices Valley offered into evidence. Moreover, both the testimony at trial and the invoices established Valley's indebtedness for the leased equipment. *Cf.* Frank Horton & Co. v. Cook Electric Co., 356 F.2d 485 (7th Cir. 1966). Although, as CEI correctly points out, the leased equipment never left Gilbert's yard in Cedar City, Utah, we perceive no requirement that equipment be on the job site before equipment leasing costs can be recovered. Peru Associates, Inc. v. State, 334 N.Y.S.2d 772 (N.Y.Ct.Cl. 1971), cited by CEI, is not to the contrary. There, the court denied a "standby equipment" claim because the claimant had equipment standing by during the first three months of the year for a project that was not scheduled to commence until June. *Id.* at 779. Therefore, we do not read *Peru* as imposing an on-the-job-site requirement for the recovery of equipment leasing costs as CEI contends. Accordingly, we reject CEI's argument as it relates to the adequacy of the evidentiary foundation for the jury's award of equipment leasing costs.

The foregoing notwithstanding, we perceive a significant distinction between equipment leasing costs, to which we believe Valley was entitled, and equipment standby or delay damages which the jury awarded Valley. It is fundamental that contract damages are prospective in nature and are intended to place the nonbreaching party in as good a position as if the contract had been performed. *See* Lagrange Construction, Inc. v. Kent Corp., 88 Nev. 271, 496 P.2d 766 (1972). The Restatement (Second) of Contracts § 347 (1979) sets forth the proper method for determining lost profits or expectancy damages. It provides:

> Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by (a) the loss in value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential

loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform.

*Id.* The actual expenses Valley incurred in leasing the heavy equipment to perform the contracts were not costs that Valley "avoided by not having to perform." *See* Tull v. Gundersons, Inc., 709 P.2d 940 (Colo. 1985); *see also* 5 Corbin, Corbin on Contracts § 1031, at 195 (1964) ("[I]n addition to 'profits' . . . the plaintiff is always entitled to the amount of expenditures that would have been reimbursed by the performance promised by the defendant before any 'profits' would begin."). Thus, Valley's *actual* equipment leasing *costs* were compensable. *Tull,* 709 P.2d at 945; Restatement (Second) of Contracts § 347, *supra. See also Peru,* 334 N.Y.S.2d at 779 (rental fee, rather than construction industry rates not used by parties to rental agreement is foundation for any allocable charges to breached contract).

In contrast to equipment leasing costs, delay damages properly compensate a plaintiff for losses sustained as a result of *delays* attributable to the defendant. Equipment standby damages, a specific category of delay damages, *see* 2 S. Stein, Construction Law, para. 11.02[2][a][ii] (1989), usually take the form of lost opportunities to rent idle equipment to others or the plaintiff's inability to use the equipment at an earlier date on another job. *Cf.* L.L. Hall Construction Co. v. United States, 379 F.2d 559 (Ct.Cl. 1966); Brand Inv. Co. v. United States, 58 F.Supp. 749 (Ct.Cl. 1944) (Littleton, J., dissenting in part). These losses, when foreseeable, are a natural consequence of the defendant's delay, and, thus, are compensable. *Cf.* Restatement (Second) of Contracts § 347(b), *supra.*

In most situations in which delay damages are awarded the defendant has caused the time of the plaintiff's performance to be extended. *See* Zook Bros. Construction Company v. State, 556 P.2d 911 (Mont. 1976); 2 S. Stein, Construction Law, para. 6.08, *supra.* Here, CEI did not *delay* Valley; rather, CEI breached the contract by not permitting Valley to perform at all. *Cf.* Conner v. Southern Nevada Paving, 103 Nev. 353, 741 P.2d 800 (1987). Although CEI failed to permit Valley to proceed and the leased equipment stood idle and was not used, Valley did not suffer compensable injury in excess of its lost profits and unavoidable costs. When it leased the equipment to perform the Laughlin project, Valley anticipated that the equipment would be in use there for three months. Therefore, by receiving its lost profits and unavoidable costs, *i.e.,* equipment leasing costs, Valley is placed

in the position it would have occupied had it performed the contract. An award of equipment standby damages, on the other hand, would permit a double recovery and give Valley a windfall. Indeed, had Valley been able to sublease the equipment to another company or use it at an earlier date on another job—the lost opportunities for which equipment standby damages are intended to compensate—the profits attributable to Valley so doing would have mitigated the losses caused by CEI's breach and, in turn, reduced CEI's liability. *Cf. id.* at 355, 741 P.2d at 801.

Under the circumstances presented here, we conclude that the damages award in excess of Valley's lost profits and equipment leasing costs was improper and must be stricken. Accordingly, we reduce the jury's award of equipment standby damages ($514,151) by the amount that it exceeds Valley's proven actual equipment leasing costs ($229,680). The total amount of damages, including lost profits, that Valley is entitled to receive from CEI is therefore $751,129.

We have carefully considered CEI's remaining contentions and conclude that they are without merit. The district court's judgment is affirmed as modified and the matter is remanded to ·that court for a redetermination of the amount of pre-judgment interest to which Valley is entitled.