TOPAZ MUTUAL COMPANY, INC., APPELLANT/CROSS-RESPONDENT, *v.* FLORENCE MARSH, RESPONDENT/CROSS-APPELLANT, AND VIRGIE ARDEN AND THE ESTATE OF JOHN ARDEN, DECEASED, CROSS-RESPONDENTS.

No. 21068

September 29, 1992 839 P.2d 606

846

*Bible, Hoy, Miller, Trachok & Wadhams*, Reno, for Appellant/ Cross-Respondent Topaz Mutual Company, Inc. and Cross-Respondent Virgie Arden.

*Allison, MacKenzie, Hartman, Soumbeniotis & Russell* and *Mike Pavlakis*, Carson City, for Respondent/Cross-Appellant.

*Gregory F. Wilson*, Reno, for Cross-Respondent Estate of John Arden.

## OPINION

*Per Curiam:*[1]

[1]This matter was originally docketed in this court to reflect that Topaz Mutual Company, Inc. and Florence Marsh were the only parties to this appeal and cross-appeal. We note, however, that Florence Marsh's "Notice of Cross-Appeal" filed March 6, 1990, specifically challenges:

That portion of the Findings of Fact, Conclusions of Law and Judgment entered in this matter on January 19, 1990 which limited Florence Marsh's recovery against defendants, Virgie Arden and the Estate of John Arden, Deceased, to $5,000 each, from that portion of the Judgment on Verdict entered in this matter on January 19, 1990 which resulted from Judge Torvinen's ruling that the maximum recovery against defendant, Topaz Mutual Company, Inc. on the Contract and Note was $73,001 and from Judge Torvinen's ruling that Florence

*Facts*

Topaz Mutual Company, Inc. (Topaz) is a privately owned public utility that supplies water to a portion of Douglas County near Topaz Lake. Topaz is owned by John and Virgie Arden through its parent corporation, Topaz Development Corporation. Florence Marsh (Marsh) is a private citizen who, in 1986, was looking for an investment opportunity to fund her stay in a retirement home in Santa Barbara, California. On March 21 of that year, ostensibly to improve the water system and retire debts, Topaz entered into a loan commitment with Marsh whereby she would loan a maximum of $121,000.00 to Topaz at an interest rate of sixteen percent per annum. According to a loan commitment agreement, Topaz expected to repay the loan through a surcharge on its customers. The loan commitment was negotiated in part by Skip Roggenbihl (Roggenbihl), a partner in Nevada Lands Association (NLA). John Arden, as president of Topaz Mutual Company, and Marsh signed the agreement.

On July 23, 1986, as required by the terms of the loan commitment, Topaz requested approval for the financing of the loan in the amount of $93,187.84 from the Public Service Commission (PSC). The PSC approved a loan in the amount of $73,001.00, contingent upon Topaz approaching at least three banks for a lower interest rate. Because it concluded that Topaz could obtain a lower interest rate elsewhere, the PSC refused to give final

---

Marsh could not maintain an action for fraud on the basis of the Intent to Loan dated March 21, 1986.

Accordingly, we have modified the caption on this court's docket to reflect that Virgie Arden and the Estate of John Arden are cross-respondents in this matter.

Further, Marsh's notice of cross-appeal, docketing statement filed June 1, 1990, answering brief and opening brief on cross-appeal filed March 8, 1991, and reply brief on cross-appeal filed May 23, 1991, all challenge the district court's limitation of unjust enrichment damages recoverable from Virgie Arden and the Estate of John Arden. These documents were all duly served upon the law firm of Bible, Hoy, Miller, Trachok & Wadhams, counsel for Topaz Mutual Company, Inc. and Virgie Arden, and upon attorney Gregory F. Wilson, counsel for the Estate of John Arden. On April 25, 1991, the law firm of Bible, Hoy, Miller, Trachok & Wadhams filed a reply brief and answering brief on cross-appeal which addresses the issues raised by Marsh on cross-appeal.

Notwithstanding service of Marsh's notice of appeal, docketing statement and briefs, attorney Wilson elected not to file a brief in response to the issues raised by Marsh on cross-appeal, to join in the reply brief and answering brief on cross-appeal filed April 25, 1991, or to otherwise enter an appearance in this court on behalf of the Estate of John Arden. Consequently, this matter was submitted for decision following oral argument on September 9, 1991, upon the briefs and oral arguments tendered by counsel for Florence Marsh and Topaz Mutual Company, Inc. and Virgie Arden.

approval to the Marsh loan, but no one informed Marsh of the PSC's decision.

On October 1, 1986, the Ardens sold their corporate properties—including Topaz, Topaz Ranch Estates, Inc. (Topaz Ranch), and others—to NLA for $7.5 million. The corporate minutes of Topaz for that date showed that the original partners of NLA—Tony Wesley Martin (Martin) and Gordon V. Ruff (Ruff)—were directors of Topaz as well as the Ardens' other corporations. Forty percent of Topaz's stock was issued to NLA, and NLA (Martin and Ruff) was authorized to enact all business on behalf of Topaz, including the funding and sale of properties. The Ardens issued a proxy for their thirty percent sharehold interest in Topaz to NLA and Ruff.

Marsh was told that NLA and its current partners—Martin, Ruff, and Roggenbihl—were purchasing the Ardens' properties and had authority to act for the Ardens. She was also told that NLA had become part of Topaz. On October 8, 1986, Marsh wrote a check to Topaz in the amount of $121,000.00, with the understanding that the funds would be used to pay for system improvements. She gave the check to Roggenbihl, who later requested that she make her check out to NLA rather than to Topaz, and Marsh issued a check for $121,000.00 to NLA. In return she received a promissory note signed by NLA and its partners, as well as a contract with Topaz signed by the partners of NLA. Unbeknownst to Marsh, the borrowers used most of the loan in an unsuccessful attempt to forestall foreclosure on Topaz Ranch, property which was not mentioned in the loan agreement, and Roggenbihl received $6,000.00 as a commission for procuring the loan. John and Virgie Arden each received $5,000.00 of Marsh's loan, and none of the money purchased system improvements. Marsh received only two of the promised interest payments on the note.

In February, 1989, Marsh filed suit against Topaz, NLA, the Ardens, Martin, Ruff, and Roggenbihl. The district court entered a directed verdict against NLA, Martin, Ruff, and Roggenbihl on their $121,000.00 promissory note. The court also ruled that Marsh's maximum allowable recovery against Topaz on the contract was $73,001.00 because of the limitation the PSC had placed on the loan. Pursuant to a jury verdict, the district court ordered Topaz to pay Marsh $73,001.00, together with interest calculated at a rate of sixteen percent per annum dating from December 8, 1986. Based on the language in the loan commitment agreement and the contract and note, the district court imposed an equitable mortgage in the sum of $73,001.00, with interest, against the assets of Topaz in favor of Marsh.

In answers to interrogatories contained in the verdict, the jury found Topaz, NLA, Martin, Ruff, and Roggenbihl liable on the fraud count and assessed damages at one-fourth of $121,000.00. Later the jury found Topaz also liable for fraud, and again assessed damages at one-fourth of $121,000.00. There was no explanation for this allocation of damages, but the net result is that each of the five parties found liable were assessed only one-fourth of Marsh's total loss or $30,250.00.

Punitive damages against Martin, Ruff, and Roggenbihl were also assessed in the amounts of $5,000.00, $10,000.00, and $20,000.00, respectively. Marsh was also awarded attorney's fees in the sum of $20,000.00 to be paid by the five parties. In addition, the court awarded $5,000.00 to Marsh against each of the Ardens, for a total of $10,000.00, on her claim of unjust enrichment.

Topaz appealed, and Marsh cross-appealed against all of the parties on the issues of the district court's limitations of the equitable mortgage and the award of unjust enrichment. By a stipulation pursuant to NRAP 28(h)[2] which was filed on December 5, 1990, Topaz, the defendant at trial, agreed to file the opening brief as appellant/cross-respondent.

## Discussion

### Damages on Fraud Claim

Jury Instruction No. 29 provided that each item of damage must be proved by a preponderance of the evidence. Topaz correctly observes that "clear and convincing evidence" and not "preponderance of the evidence" is the correct burden of proof with respect to the fraud claim. Read out of context, the jury instruction is misleading. However, the jury received instructions on fraud that adequately informed it of the proper burden of proof. Jury Instruction No. 25, which outlined the essential elements of fraud, including damage to Marsh, provided that each element must be proved by clear and convincing evidence. Additionally, Jury Instruction No. 27 defined "clear and convincing" as "beyond a mere preponderance of the evidence."

Where other instructions inform the jury of information contained in a proposed instruction, the trial court need not give the proposed instruction. Colorado Environments v. Valley Grading,

---

[2]NRAP 28(h) provides in part:

> In cases involving a cross-appeal, the plaintiff in the court below shall be deemed the appellant for all purposes, *unless the parties otherwise agree* or the court otherwise orders.

(Emphasis added.)

105 Nev. 464, 467, 779 P.2d 80, 82 (1989); Beattie v. Thomas, 99 Nev. 579, 583-84, 668 P.2d 268, 271 (1983); *see* Gordon v. Hurtado, 96 Nev. 375, 609 P.2d 327 (1980) (no reversal for giving of jury instruction which is not technically correct is required where, taking into consideration all of instructions given, jury was sufficiently and fairly instructed). Because the related instructions adequately informed the jury of the standard' of clear and convincing evidence, Instruction No. 29 was not so misleading as to warrant reversal.

The jury found five parties—NLA, Topaz, Martin, Ruff, and Roggenbihl—guilty of fraud, but only awarded damages of $30,250.00 against each party. The jury unequivocally found Topaz guilty of fraud and determined that the total amount of damage suffered by Marsh because of the fraudulent acts was $121,000.00. The Ardens had turned control of Topaz over to NLA, Martin, and Ruff, and this provided sufficient evidence to hold Topaz liable for their fraudulent acts. Topaz and the Ardens claim, as does the dissent, that Martin and Ruff were "rogues" and that they proved to be. But, it was the Ardens who turned over control of Topaz to Martin and Ruff in the fall of 1986 and empowered them to act for Topaz.

Concerning damages, Topaz has observed on appeal that, "The amount of damages awarded against Topaz for fraud represents the amount of the contract and note divided by four of the defendants ($121,000.00 divided by 4 equals $30,250.00)." Under the facts of this case, Marsh's loss on the fraud claim was either $121,000.00 or nothing. Once the jury found the five parties liable to her for fraud and her total damage of $121,000.00 because of their fraudulent conduct, each party should have been found jointly and severally liable for the total amount. *See* Price v. Aztec Limited, Inc., 701 P.2d 294 (Idaho Ct.App. 1985) (rule of joint and several liability prevails where tortfeasors act in concert in execution of common purpose). However, since Marsh has not claimed on appeal that the fraud damages were improperly restricted or divided by the jury and the parties have not briefed this issue, we decline to alter in Marsh's favor the fraud damages imposed, and we leave those damages as assessed by the jury and entered by judgment of the district court.

Topaz argues that Marsh should have been forced to proceed against Topaz on either the contract or fraud claim, but not both, and that the resulting awards against Topaz will permit Marsh a double recovery. We disagree. A plaintiff may assert several

claims for relief and be awarded damages on different theories. It is not uncommon to see a plaintiff assert a contractual claim and also a cause of action asserting fraud based on the facts surrounding the contract's execution and performance. *See* Amoroso Constr. v. Lazovich and Lazovich, 107 Nev. 294, 810 P.2d 775 (1991). The measure of damages on claims of fraud and contract are often the same. However, Marsh is not permitted to recover more than her total loss plus any punitive damages assessed. She can execute on the assets of any of the five parties to the extent of the judgments entered against them until she recovers her full damages.

*The Contract Claim*

Topaz argues that the loan is void because it lacked PSC approval for the full amount. Other states' statutes declare a transaction void ab initio if it is made to a public utility without approval of the commission that regulates public utilities. *See, e.g.,* Vt.Stat.Ann.tit. 30, § 107(c)(4) (1991 Supp.); *see also* Hogue v. Superior Utilities, 210 P.2d 938 (N.M. 1949) (the note and mortgages of a corporation operating a gas distribution system were void where not authorized by the Public Service Commission as required by statute). NRS 704.323(1) provides as follows:

> No privately owned public utility organized under the laws of and operating in the State of Nevada shall issue any security, or assume any obligation as guarantor, endorser, surety or otherwise, in respect of any security of any other person, firm or corporation, unless and until, and only to the extent, authorized by a written order of the commission.

*See also* NRS 704.325,[3] which prohibits unapproved use of proceeds. NRS 704.323(1) and 704.325 do not expressly render an unauthorized loan or transaction void. The statutes, in effect, make an unapproved loan or security transaction voidable by any party in interest, the public utility, the lender, or the Public Service Commission. Normally, the statutes that regulate public utilities should be given full force and effect, and loans or other transactions with utilities which have not secured PSC approval

---

[3]NRS 704.325 provides as follows:

No public utility shall, without the consent of the commission, apply any security or any proceeds thereof to any purpose not specified in the commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order.

will be deemed voidable and thus unenforceable. However, the facts of this case compel us to reach a different result.

Marsh always intended to make a loan to Topaz to improve the utility's water delivery system. While the agreement to loan and the subsequent promissory note indicated that PSC approval was necessary, Topaz, through the fraudulent conduct of its officers and directors, represented to Marsh that approval had been secured and that it was appropriate to make the loan in the full amount. In reliance on the false representation, Marsh issued her check in the amount of $121,000, but none of the money was used for the system's improvement, and the bulk of the funds was diverted to forestall foreclosure on the Ardens' ranch, which was not an asset of Topaz. If we permit Topaz to claim that the loan, which was consummated by fraudulent acts of its officers and directors, is unenforceable pursuant to NRS 704.325, we will be permitting the utility to profit from its own wrongful conduct. This we will not do.

To enforce the contract only to the limit of the PSC approval would allow Topaz to escape full responsibility for its misrepresentations and would penalize Marsh, who loaned the full sum requested in good faith and on the assumption that Topaz would utilize the loan proceeds to improve the utility's water system and debt structure. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265 (1946). The duty of good faith and fair dealing is created by law in all contracts. K Mart Corp. v. Ponsock, 103 Nev. 39, 48, 732 P.2d 1364, 1370 (1987). Equitable estoppel is applied to prevent manifest injustice and hardship to an injured party as in Cheqer, Inc. v. Painters & Decorators, 98 Nev. 609, 665 P.2d 996 (1982), where a hospital relied to its detriment on a letter of approval which specified a timetable within which to act or lose authorization to proceed with the project, and this court held that the Department of Human Resources was estopped from vacating its previously issued letters of approval.

Equitable estoppel functions to prevent the assertion of legal rights that in equity and good conscience should not be available due to a party's conduct. United Brotherhood v. Dahnke, 102 Nev. 20, 714 P.2d 177 (1986). Thus, when a party acts in bad faith and with an intent to defraud, it can be estopped from challenging the enforceability of a contract executed because of that conduct. Since Marsh acted to her detriment in reliance on

the misrepresentations by Topaz's officers and directors, and it was represented to her that PSC approval had been obtained, the principle of equitable estoppel applies to prevent Topaz from now asserting that the contract is voidable. Therefore, we conclude that the district court erred in ruling that the loan was enforceable only to $73,001.00, the amount that the PSC had expressly approved.

Because utilities have a monopoly on a necessary service, they are regulated to protect the ratepayers, the public, and the parties who transact business with them. We are not only concerned about the impact of NRS 704.323(1) and 704.325 upon a good faith lender who is defrauded by the utility, but also upon the impact that the judgment will have on the ratepayers of Topaz. "The purpose of a regulatory agency is 'to protect power consumers against excessive prices' by assuring that costs passed-through into utility rates are just and reasonable." Alliance for Aff. Energy v. New Orleans, 578 So.2d 949, 972 (La.Ct.App. 1991) (quoting Pennsylvania Power Co. v. F.P.C., 343 U.S. 414, 418 (1951)). Nevada law specifically requires that charges made by a public utility for services rendered must be just and reasonable (NRS 704.040(1)); and every unjust and unreasonable charge is unlawful (NRS 704.040(2)).

Given the fraudulent and unauthorized conduct of the officers and directors of Topaz, none of the burdens of this judgment should be passed on or charged to its ratepayers, but rather borne solely by Topaz. Nevada Power v. Public Service Commission, 105 Nev. 543, 545, 779 P.2d 531, 532 (1989) (a judgment may require a utility to satisfy it through the owners' equity rather than to permit the cost to be passed on to the ratepayers.) We therefore hold that neither the ratepayers, who were deprived of the protection the PSC sought to provide them, nor Marsh, who parted with the full amount of the loan proceeds, should be forced to bear the burden created by the manipulative conduct and breach of contract attributable to Topaz and its officers and directors. Marsh is entitled to the full amount of her contract damages plus interest against Topaz, none of which may be passed on or charged to the ratepayers.

*Assessment of Equitable Mortgage*

Based on the loan commitment agreement as well as the contract and note, the district court imposed an equitable mortgage against Topaz of $73,001.00. The contract and note states in part:

The signers of this contract are declared individually and

jointly responsible for repayment of this note and agree to underwrite the contract by pledge of personal credit as well as *income derived from sale of water and other assets* of Topaz Mutual Co. as security for the principal amount of $121,000.00 and all accrued interest when due.

(Emphasis added.)

The note in favor of Florence Marsh for $121,000.00, signed by Martin, Ruff, and Roggenbihl as Nevada Lands Association, a Nevada General Partnership, contains the following language:

This note is secured by the *assets of Topaz Mutual Water Company Inc.*, a Nevada Corporation in an amount equalling the face value of this promissory note. The present total assets of Topaz Mutual Water Company Inc. include $1,335,000.00 of water rights plus office and physical assets of: $1,469,725.00.

(Emphasis added.) At the time these documents were executed, the Ardens, as majority stockholders of Topaz, as well as the principal officers, had relinquished control of Topaz to NLA.

In Nee v. L. C. Smith, Inc., 97 Nev. 42, 47-8, 624 P.2d 4, 7 (1981), this court stated: "A mortgage is usually considered to be a nominal conveyance, held in abeyance, of certain property as a security for the payment of a certain debt. If the parties intend to create a mortgage, no particular form of instrument or words is necessary to create an equitable mortgage." (Footnote omitted; citations omitted.) We do not question the district court's reasons for imposing the equitable mortgage. However, Topaz argues that the property to be impressed with this lien was not sufficiently identified in the documents, and therefore, the equitable lien cannot be imposed. For an equitable mortgage to be imposed, there must be an identifiable res. "In order for an agreement to give a mortgage to be considered an equitable mortgage it must clearly describe or point out the property intended to be charged with the lien." 59 C.J.S. *Mortgages* § 16 (1949 & Supp. 1992). In its judgment, the district court imposed the lien on the assets and income of Topaz. This is what the documents specifically stated would be the security to guarantee the loan repayment. While the defined property is described in broad terms, Topaz agreed to the language, and the identification of the res as the profits and income of a company is a sufficient identification of the property to be encumbered by an equitable lien. *See* Sundheim v. School Dist., 166 A. 365 (Pa. 1933) (an equitable lien is created on a particular fund when a written contract indicates an intention for it to secure a debt); Field v. Lang, 32 A. 1004 (Me. 1895) (equitable liens may be applied to rents and profits).

Since we have determined that Marsh should recover $121,000.00 plus interest and the property to be subject to the lien was sufficiently described, the imposition of the equitable lien by the district court is affirmed and the amount of the lien shall be increased to $121,000.00.

## Unjust Enrichment

The district court limited the unjust enrichment claim against John and Virgie Arden to a maximum of $10,000.00 and did not submit the claim to the jury for its decision, but instead reserved that decision for itself to make at the conclusion of the trial. Without ruling on the court's reservation of this issue, we conclude that limiting the recovery to a maximum of $10,000.00 was error. A major portion of the loan proceeds ($87,000.00) went to the Federal Land Bank in order to postpone foreclosure twice on the Ardens' Topaz ranch. Some of the proceeds funded improvements on the ranch. Other portions of the loan proceeds went to various parties, including a $6,000.00 commission to Roggenbihl which Marsh did not know about.

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Nevada Industrial Dev. v. Benedetti, 103 Nev. 360, 363 n.2, 741 P.2d 802, 804 n.2 (1987). This court has observed that the essential elements of unjust enrichment "are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit." Unionamerica Mtg. v. McDonald, 97 Nev. 210, 212, 626 P.2d 1272, 1273 (1981).

Postponing foreclosure on a property benefits the owner by reducing his or her total debt and by allowing additional time to negotiate a sale. Improvements made to a property also benefit the property owner. Thus, the proceeds used to postpone foreclosure and improve the ranch at least indirectly benefited the Ardens and may have directly benefited them. If permitted to consider these additional benefits to the Ardens, the jury or court may conclude that they benefited by more than $10,000.00. *See* John A. Artukovich, Etc. v. Reliance Truck, 614 P.2d 327 (Ariz. 1980) (trucking company was liable to owner of crane under theory of unjust enrichment because trucking company received a benefit by using the crane); Restatement of Restitution § 1 cmt. b (1937). Because these are questions for the jury or court to consider, we reverse and remand to the district court for a new trial concerning the extent of the Ardens' unjust enrichment.

## Conclusion

Accordingly, we affirm the fraud judgment against Topaz and increase the contract judgment to $121,000.00 plus interest. We also affirm the imposition of an equitable mortgage levied against Topaz's assets and income and remand to the district court to increase the amount of this lien as indicated. Finally, we reverse and remand for a new trial as to the extent of the Ardens' unjust enrichment.

YOUNG, J., dissenting:

Respectfully, I dissent. Complex cases, like hard cases, make bad law—and this is indeed a complex case. It presented difficult questions to the jury, the trial judge, and our court on appeal. Moreover, the questions were considered in an atmosphere of profound sympathy for Marsh, a person of advanced years who was cynically swindled out of $121,000.00 by three unscrupulous men, Roggenbihl, Martin and Ruff.

It has been well said that a camel is a horse put together by a committee. I suggest that the majority opinion is, figuratively speaking, a judicial camel. It not only perpetuates error committed below, but enhances it at the appellate level. I respectfully submit, for reasons stated hereinafter, that the matter should be sent back for a new trial before a properly instructed jury on both liability and damages.

### Facts

Events underlying the instant lawsuit are as follows: In 1985, Roggenbihl began living on Marsh's property in Verdi, first, in a camping trailer and later, in her home while she was away receiving medical treatment. He became her confidant and helper. Late in 1985, Marsh paid Roggenbihl a ten percent commission for assisting her in the sale of water rights. She apparently had so much confidence in him that at one time Marsh wanted him to serve as a director and secretary of her corporation.

Roggenbihl learned that Topaz, a privately owned utility, was seeking financing to improve its water system. He sought to create a financial arrangement that would be beneficial to both Marsh and Topaz—and to himself through some type of finder's fee if a loan was made.

An agreement, entitled "Intent to Loan," was signed by Topaz and Marsh on March 21, 1986. It provided for a maximum loan by Marsh to Topaz in the amount of $121,000.00 at sixteen percent interest. Loan purposes were expressly limited to: (a) paying the balance of an existing loan for Phase One improvements; (b) paying the balance due a parent corporation for

advances made for Phase One; and (c) paying contractors and suppliers for improvements to be completed under Phase Two. The agreement, which was prepared with Marsh's assistance and carefully reviewed by her, provided that Topaz was obligated to provide Marsh with: (1) a copy of the PSC's approval "prior to any request for funding"; and (2) a "note and assignment of all collections of surcharge from individual customer service and from each collection of new hook-up fees."

Four months later on July 23, 1986, Topaz submitted its application to the PSC (as required by law) for approval of financing in the amount of $93,187.84 with sixteen percent interest. The PSC concluded that an institutional lender would probably give Topaz a lower rate of interest. Consequently, the PSC conditioned its approval of a loan from Marsh upon Topaz first approaching at least three other lenders to determine if money would be available at less than sixteen percent. No such effort was ever made by Topaz. Phase Two improvements were ultimately completed without borrowing by Topaz.

The Ardens, also elderly and in poor health (John Arden died before trial), wanted to retire from real estate development and on October 1, 1986, entered into a contract of sale of their properties with NLA, a partnership of Roggenbihl, Ruff and Martin. Included in the contract of sale was the Topaz Ranch which was encumbered by a first deed of trust to the Federal Land Bank; the note secured by the trust deed was in default. In the contract, NLA not only agreed to purchase all the Arden properties (including the Topaz Ranch) but to assume all liens and encumbrances.

In early October 1986, prior to the PSC's decision on Topaz's application for permission to borrow (the decision was filed November 5, 1986), Roggenbihl fraudulently told Marsh that the loan conditions had been met and asked Marsh to fund the Topaz loan. On October 8, 1986, Marsh made out a check to Topaz Mutual Company in the amount of $121,000.00 and gave it to Roggenbihl. Roggenbihl mentioned this to Virgie Arden who immediately told him that the check could not be accepted because the Topaz application had not been approved by the PSC. Roggenbihl then returned the check to Marsh and fraudulently told her that another check would be required.[1] Having an abiding confidence in Roggenbihl, Marsh gave him a check dated October 21, 1986, in the amount of $121,000.00, payable not to Topaz, Roggenbihl, Martin or Ruff, but to NLA.

---

[1] In support of this request, Roggenbihl prepared what was entitled a "Contract and Note" (dated October 18, 1986) in which, for the first time, he, Ruff and Martin, as well as Topaz, were shown as borrowers.

Marsh had no communication with the Ardens (who were directors of Topaz) concerning the loan after the Intent to Loan was signed March 21, 1986, until July 1987. The $121,000.00 check payable to NLA was deposited into NLA's checking account. The Ardens were totally unaware of the fraud perpetrated by NLA and knew nothing of the check to NLA until July 1987, almost ten months later. None of the $121,000.00 was ever received by Topaz.

In return for the check to NLA, Marsh received: (1) a promissory note executed by NLA, signed by Roggenbihl, Martin and Ruff; and (2) a Contract and Note signed by Roggenbihl, Martin and Ruff. Although the Contract and Note and promissory note purported to pledge assets of Topaz, they were not signed by the corporation nor by anyone on its behalf.

The verdict alone reflects the difficulty experienced by the jury in considering the issues. The jury was permitted to pass on the issue of liability on the contract (Contract and Note dated October 18, 1986), but not on damages resulting from the alleged breach. The court arbitrarily set damages at $73,001.00.

I am at a loss to understand how the amount conditionally approved by the PSC ($73,001.00), three weeks after the fraud perpetrated by Roggenbihl, Martin and Ruff, is probative of damages. Presumably, if the PSC had conditionally approved the full amount sought in the Topaz application ($93,187.84), this would have been designated as the amount of damages against Topaz for breach of a contract never executed by Topaz or on its behalf and for failure to repay a loan which probably never would have been made!

Confusion also seemed to reign supreme when the jury determined damages for fraud. In answers to special interrogatories, the jury set damages for each of five defendants at "¼ of $121,000 + interest." The five separate awards total $151,250.00. Did the jury intend a total of $151,250.00 or only $121,000.00? If $151,250.00 was intended, presumably the award against each would have been "⅕ of $151,250 + interest." The jury was apparently not instructed on legal principles governing joint and several liability which probably contributed to a sincere, but perhaps misguided, attempt to apportion tort damages.

Another perturbing fact was the treatment of the sum "¼ of $121,000 + interest." May the court simply ignore the "+ interest" in the verdict form? The jury was instructed that damages "shall be the difference, if any, between the actual value of that which [Marsh] received and the value which she would have had if the fraudulent misrepresentations had been true."

The trial court awarded interest on the tort damage

($30,250.00 for each dependent) "with interest thereon at the legal rate from February 3, 1988" (the date the complaint was filed). I respectfully submit that the jury, in awarding a sum "+ interest," was strictly following the court's instruction. If the fraudulent misrepresentations had been true, Marsh would have received sixteen percent interest commencing October 18, 1986 (date of Contract and Note). From this date until the jury fixed damages in its verdict (September 21, 1989) thirty-five months later, the interest would have amounted to over $400.00 per month per defendant on the sums awarded.[2]

I respectfully suggest that before the jury was discharged, the court and counsel should have made an effort to resolve these disturbing issues. With proper instructions to the jury, this could have readily been done.

In sum, the jury experienced a frustrating assignment. It was given the daunting task of determining contract liability with insufficient instructions (as will be set forth hereinafter); it was denied the opportunity to determine contract damages; it was inadequately instructed on tort damages; and its award of interest as a component of tort damages was ignored by the court although the jury was dutifully following instructions.

I suggest that the problems in connection with the jury alone taint the judgment and warrant a new trial.

The contract claim against Topaz is predicated upon two documents, a promissory note dated October 8, 1986, in the amount of $121,000.00 payable to Marsh or her survivors[3] and a document

---

[2]Arguably, the sixteen percent interest should be computed only until the complaint was filed (February 3, 1988). If $121,000.00 had been awarded with joint and several liability, interest would have amounted to $19,370.00 per year or over $1,600.00 per month for whatever period would be appropriate.

[3]The promissory note reads as follows:

PROMISSORY NOTE

$121,000.00 Dated: October 8, 1986

For value received, the undersigned, NEVADA LANDS ASSOCIATION, A Nevada General Partnership, with principal office for the transaction if its' business at 425 Gentry Way #B, Reno, Nevada 89502 does hereby promise to pay Florence Marsh or her survivors the principal sum of One Hundred Twenty One Thousand Dollars ($121,000.00) together with interest thereon of sixteen percent (16%) per annum on decreasing balance from the eighth day of October, 1986 until paid in full. Payments are due the eighth of each month.

Public Service Commission is scheduled to come on line within 60 days. Interest only on principal will be paid until Public Service Commission comes on line at the rate of sixteen percent (16%) per annum. Payments on principal and interest will commence thereafter.

This note is secured by the assets of Topaz Mutual Water Company Inc., a Nevada Corporation in an amount equalling the face value of this promissory note. The present total assets of Topaz Mutual Water Company Inc. include

entitled "Contract and Note With Topaz Water Company Inc. and Tony Wesley Martin, Gordon V. Ruff and William R. Roggenbihl."[4]

---

$1,335,000.00 of water rights plus office and physical assets of: $1,469,725.00.

The maker hereof waves demand, notice, protest and diligence and the maker hereof further promises that if this Note and the interest thereon are not fully paid as above provided, it will pay all costs and expenses, including a reasonable attorney's fee, that may be incurred in collecting this Note or any part thereof.

> Nevada Lands Assoc.
> A Nevada General Partnership
> s/..............................................................
> Tony Wesley Martin, Partner
> s/..............................................................
> Gordon V. Ruff, Partner
> s/..............................................................
> William R. Roggenbihl

STATE OF NEVADA }
 } ss:
COUNTY OF WASHOE }

On this 13th day of October, 1986 personally appeared before me, the undersigned, a notary public in and for the County and State aforesaid, TONY WESLEY MARTIN, GORDON V. RUFF, AND WILLIAM R. ROGGENBIHL, general partners, known to me to be the person described in and who executed the within instrument, and who acknowledged to me that they executed the same freely and voluntarily and for the uses and purposes therein mentioned.

s/..............................................................
LORRAINE W. YOUNG

[4]The Contract and Note reads as follows:

CONTRACT AND NOTE WITH TOPAZ WATER COMPANY INC.
AND TONY WESLEY MARTIN, GORDON V. RUFF AND
WILLIAM R. ROGGENBIHL

Florence Marsh agrees to loan the sum of $121,000.00 to Topaz Mutual Company and Tony Wesley Martin, Gordon V. Ruff, and William R. Roggenbihl who agree to secure said loan with sufficient personal assets as to guarantee the whole amount of the aforementioned principle [sic]. Interest payments are to be made at the rate of 16% annually, and paid on the eighth of every month. Terms of the loan shall be in effect for no less than one year from the date of signing this agreement and no longer than three years from the date of the signing of this contract.

The signers of this contract are declared individually and jointly responsible for repayment of this note and agree to underwrite the contract by pledge of personal credit as well as income derived from sale of water and other assets of Topaz Mutual Co. as security for the principal amount of $121,000.00 and all accrued interest when due.

In the event of default by Topaz Mutual Co. or failure to make timely payment on interest and principle [sic] sums agreed upon in attached note, the signatories agreed to personally carry the loan until such time as Topaz Mutual Company can carry the loan obligation.

In the event that Topaz Mutual Company is sold this note and contract IS NOT TRANSFERABLE to new ownership and becomes due and payable at

In the promissory note, the obligor clearly was NLA. On the day this was executed, Marsh gave Roggenbihl a check payable to Topaz in the amount of $121,000.00.

Upon being advised of this by Roggenbihl, Virgie Arden told him that Topaz could not borrow money until the PSC approved its application. The borrowing of money by Topaz without PSC approval or assumption of liability by Topaz in violation of NRS 704.323 would subject any person involved to criminal penalties. NRS 704.640. The expenditure of any funds for purposes not approved by the commission is also prohibited by statute. NRS 704.325.

Roggenbihl, Martin and Ruff then went back to the drawing board and prepared the Contract and Note wherein they themselves were designated as borrowers along with Topaz. Pursuant to this document, Marsh gave Roggenbihl a check payable not to Topaz, but to *Nevada Lands Association* in the amount of $121,000.00. This Contract and Note was not signed on behalf of Topaz although the document states in the second paragraph that

---

time of sale in the sum of the principle [sic] amount of $121,000.00 together with all interest to the end of calendar year in which said sale is consummated.

In the regular course of events this contract and note may, at the beneficial agreement of parties concerned, be opened for negotiation at the end of the third full calendar year from the time of the original date of signatory agreement.

All legal charges and fees required to ensure the timely execution of this contract and its terms shall be bourne [sic] by the Topaz Mutual Company as an integral part of this agreement.

It is acknowledged and agreed that there is no prepayment privilege on this note for the three year period from date of signature, however in the event Topaz Mutual Co. wishes to retire this note and contract said company may, contingent on agreement of Florence Marsh, retire the note and remaining interest due.

s/...................................................................
Tony Wesley Martin
s/...................................................................
Gordon V. Ruff
s/...................................................................
William R. Roggenbihl

STATE OF NEVADA 
COUNTY OF WASHOE ss:

On this 18th day of October, 1986, personally appeared before me, the undersigned a notary public in and for the County and State aforesaid, TONY WESLEY MARTIN, GORDON V. RUFF, WILLIAM R. ROGGENBIHL, general partners, known to me to be the persons described and who executed the within and foregoing instrument, and who acknowledged to me that they executed the same freely and voluntarily and for the uses and purposes therein mentioned.

s/...................................................................
LORRAINE W. YOUNG

the "signers . . . agree to underwrite the contract by pledge . . . of income derived from sale of water and other assets of Topaz Mutual Co. . . . ."

The signers were Roggenbihl, Ruff and Martin and the acknowledgement, identical except for the date, indicated that they signed as "general partners"—presumably of NLA. To the extent that the document purported to create liability or put a lien on Topaz's income or assets, it was in violation of NRS 704.323 because *no* approval had been given or *was ever* given for Topaz to borrow or provide security. The Ardens did not become aware of the Marsh payment to NLA until July of the *following year. None* of the Marsh money ever went into a Topaz account or benefitted Topaz in *any way.*

Put in perspective, what happened was simply that three rogues fraudulently took money that Marsh thought was going to Topaz and cynically used it for their own purposes. Trial was largely devoted to determining whether Topaz and the Ardens would be liable for the wrongdoing of three scoundrels as a result of the Ardens entering into a contract on October 1, 1986, to sell their properties to NLA. The partners in NLA at the time the contract was executed were Ruff and Martin. Subsequently, and in apparent recognition of his demonstrated ability to raise funds, Roggenbihl was given a minor partnership interest—and a $6,000.00 finder's fee.

The majority opinion predicates its decision to increase the damages on the Contract and Note from the $73,001.00 (the sum awarded by the trial court) to $121,000.00 (the sum referred to in the Contract and Note) upon "the fraudulent conduct of its officers and directors . . . ."

I respectfully submit that this sweeping characterization is not supported by the record. The principal architect of the fraud was Roggenbihl, a confidant of Marsh, and the *only* person from either NLA or Topaz in contact with her. Neither of the Ardens saw Marsh from March 1986 (when the Intent to Loan was signed) until August 1987.[5]

Ruff and Martin were arguably directors of Topaz as a result of the October 1, 1986, agreement between NLA and the Ardens. Ruff never met Marsh until the August 1987 meeting called by Virgie Arden. Martin informally met Marsh in 1985 but neither saw her nor communicated with her until the August meeting in 1987. Roggenbihl was neither a director nor officer of Topaz. The Ardens remained directors of Topaz and assuming the October 1,

---

[5]Marsh called Virgie Arden in July 1987 complaining about nonpayment of the note. This was the first information received by the Ardens of the Marsh check to NLA dated October 18, 1986, and caused Virgie Arden to call a meeting in August.

1986, sales agreement made Ruff and Martin also directors, there were no board meetings where receipt of funds from Marsh were discussed. To have borrowed money without PSC approval would have exposed the directors to criminal penalties. Virgie Arden specifically told this to Roggenbihl when he advised her that he had a $121,000.00 check from Marsh for Topaz. This necessitated a change in strategy by Roggenbihl; he then resourcefully caused the Contract and Note to be drafted where he, Martin and Ruff would be borrowers—and the check ultimately was made payable to NLA (by which time he was then presumably a partner for his distinguished fund-raising ability).

Neither the promissory note nor the Contract and Note was signed by or on behalf of Topaz. Even if signed by Topaz, it would have been necessary to show actual or apparent authority. *Dixon v. Thatcher*, 103 Nev. 414, 742 P.2d 1029 (1987). Clearly there was no actual authority here. This is generally in the form of a board resolution authorizing an agent's conduct.

The next inquiry is to whether Roggenbihl had implied or apparent authority to bind Topaz. Apparent authority may under certain circumstances be predicated on estoppel where a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing under such circumstances as to estop the principal from denying its existence. *Orbit Stations, Inc. v. Curtis*, 100 Nev. 205, 207, 678 P.2d 1153, 1154 (1984).

I suggest that the evidence here does not establish estoppel. None of the directors or officers had been in touch with Marsh. Topaz's position was set forth in the Intent to Loan agreement with Marsh going back to March 1, 1986, which indicated that a copy of the PSC approval would be furnished prior to any request to borrow. The Ardens presumed they had stopped any efforts to borrow for Topaz when Virgie Arden told Roggenbihl that the PSC had not approved the Topaz application and therefore the October 8, 1986, check could not be accepted. Roggenbihl, who was not acting with authorization from Topaz in obtaining the check in the first place, then returned it to Marsh and inveigled her out of another check for $121,000.00, this time payable to NLA with the loan said to be secured by the Contract and Note, which although purporting to be an obligation of Topaz and pledge of its assets, was not signed by Topaz.

The acts of Roggenbihl without more do not create an estoppel. "In this respect it is stated in 1 Mecham On Agency (Second Edition) 513, secs. 725, 726, (Liability by estoppel):

> 'The acts of the agent in question can not be relied upon as alone enough to support an estoppel. If his acts are relied upon there must also be evidence of the principal's knowledge and acquiescence in them.

'Moreover, in any case, the reliance must have been a reasonable one, consistent with the exercise of reasonable prudence, and the party who claims reliance must not have closed his eyes to warning or inconsistent circumstances. . . . If the inferences against the existence of the authority are just as reasonable as those in favor of it, there can be no reliance within this rule.' ''

Ellis v. Nelson, 68 Nev. 410, 419, 233 P.2d 1072, 1076 (1951).

Probably blinded by her confidence in Roggenbihl, there is substantial evidence that Marsh failed to heed clues that Roggenbihl, Martin and Ruff were acting outside the scope of their authority. Marsh had helped draft the Intent to Loan document signed by Topaz and herself. She knew a request to borrow had been submitted to the PSC. She knew from the language of the promissory note that PSC approval had *not* occurred. She knew that under the Intent to Loan agreement, Topaz "*will provide* lender with a copy of the commission's order prior to any request for funding." She knew the first check (payable to Topaz) had been returned to her. She knew that neither the promissory note nor Contract and Note was signed by Topaz. She knew the check of October 21, 1986, was made out to Nevada Lands Association. She was manifestly put on notice that something unusual was occurring.

In view of the foregoing, it was error for the court to refuse the following instruction offered by Topaz:

A director or directors of a corporation may bind the corporation to a contract only if the purpose and object of the director is to enter into the contract for the benefit of the corporation. If a director or directors enter into a contract for personal benefit, then the contract does not bind the corporation unless ratified by either a majority of the stockholders or the board of directors.

I further submit that the court erred even more egregiously in giving Jury Instruction No. 20 which provided as follows:

For Topaz Mutual Company to be liable to plaintiff on the Contract and Note, the plaintiff must prove the following by a preponderance of the evidence:
1. The execution of the Contract and Note on behalf of Topaz Mutual by its directors or its agent;
2. That by a check dated October 21, 1986, Mrs. Marsh intended to lend $121,000 to Topaz Mutual Company;
3. That the condition of paragraph six of the November 5, 1986, Public Service Commission order was satisfied.

Topaz's counsel objected to subsection 3 of this instruction and

suggested that the jury should instead be given the chance to decide whether there had been approval of the loan pursuant to NRS 704.323, which provides in relevant part: "No privately owned public *utility . . . shall* issue any security, or *assume any obligation* as guarantor, endorser, surety or otherwise, in respect of any security of any other person, firm or corporation, *unless and until,* and only to the extent, *authorized by a written order of the commission."* (Emphasis added.)

Marsh's payment to NLA occurred more than two weeks *prior* to the PSC order and the condition of paragraph six of the PSC order was *never* satisfied. Under paragraph six, Topaz was to "make diligent efforts to finance Phase II improvements . . . at less than sixteen percent interest. Only after demonstrating to staff that their efforts have failed may the applicant obtain financing at sixteen percent interest."

Indisputably, Topaz made no effort to obtain financing at less than sixteen percent interest. Thus, there was never approval by PSC staff and no authorization under Nevada law. In view of the uncontroverted evidence that the conditions had not been satisfied, it was error to even present to the jury an opportunity to find it had been satisfied. To conclude there was contractual liability, the jury had to find the condition of paragraph six was satisfied and there was *no* evidence to support the finding.

The trial court denied the claim by Marsh against Topaz based on the promissory note dated October 8, 1986, in the amount of $121,000.00. The claim was dismissed by the court on a motion pursuant to NRCP 41(b) because it was signed only in the name of NLA Partnership. The acknowledgement shows it was signed by "Tony Wesley Martin, Gordon V. Ruff, and William R. Roggenbihl, general partners."

However, the court found contractual liability against Topaz on the Contract and Note of October 18, 1986, notwithstanding that it was signed by the same three individuals. The check was made payable to Nevada Lands Association who was not even named as a borrower! The acknowledgement on this document, except for the date, was identical to that on the promissory note, and indicated that the parties affixed their signatures as "general partners."

The court apparently concluded that: (1) the $121,000.00 loan to NLA by Marsh was really a loan to Topaz; (2) a PSC approval on a conditional order more than two weeks later in November somehow related back to the October date of the check; (3) compliance with the conditions had either occurred or was unnecessary; and (4) the $121,000.00 check to NLA created a $73,001.00 loan repayment obligation for Topaz even though Topaz received none of the money and the conditions of the PSC order had not been met!

I suggest that the trial court erred. On the surface, the loan was not to Topaz. To the extent that by estoppel or otherwise it might be deemed to be a Topaz loan, it was clearly in violation of law and would subject all parties, presumably even the Ardens (who were not aware of the payment until ten months later), to criminal penalties. NRS 704.640.

My colleagues in the majority concede that NRS 704.323 presents a problem to find contract liability by saying that "[n]ormally, the statutes that regulate public utilities should be given full force and effect, and loans or other transactions with utilities which have not secured PSC approval will be deemed voidable and thus unenforceable. However, the facts of this case compel us to reach a different result."

The opinion rationalizes its disregard of the clear provisions of NRS 704.323 by saying that unless liability is enforced in the amount of $121,000.00,[6] "we will be permitting the utility to profit from its own wrongful conduct. This we will not do."

Just what profit the majority found to have gone to the utility is unfortunately not described. The evidence is undisputed that *not one cent* of the money fraudulently acquired by Roggenbihl, Ruff and Martin was *ever* received by Topaz. Any money going to Roggenbihl, Ruff and Martin was obviously *not* profit to Topaz.

I submit that the majority's perception of "profit" accruing to Topaz would not overcome the clear statutory bar to contract liability. To conclude otherwise would make statutory law subservient to the law of judges. This I submit would be inconsistent with our system of justice. As Justice Cardozo wisely pointed out, "[t]he Constitution overrides a statute, but a statute if consistent with the Constitution overrides the law of judges." Benjamin M. Cardozo, *The Nature of the Judicial Process* 14 (1921).

Turning now to the lien upon the assets of Topaz, I suggest that the trial court erred in granting an equitable lien "upon the assets of Topaz Mutual for the sum of $73,001.00." The trial judge's decision was predicated upon both the promissory note and Contract and Note. Ruling upon an NRCP 41(b) motion, the court rejected Marsh's contract claim on the promissory note against Topaz because it was signed only by the partnership. Upon its face, the promissory note violated NRS 704.323 by purporting to pledge Topaz's assets before PSC approval. Having properly rejected contract liability on the note, I submit it was contrary to both logic and law to then find the same note was somehow a predicate for an equitable lien on *all* of Topaz's assets.

Similar arguments can be made against creating a lien on the

---

[6]The record shows that $20,028.78 was received from Virgie Arden and the estate of John Arden with partial satisfaction filed April 4, 1991.

Topaz assets by the terms of the Contract and Note. It was in violation of law when signed, no money was received by Topaz as a result of the note, it was not signed on behalf of Topaz, and the document by its express terms states that the "signers of the contract" pledge the income and assets of Topaz. By no stretch of the imagination or through any innovative legal doctrine can Topaz be deemed a signer.

There is a sound public policy behind NRS 704.323, namely, to protect utility customers from the threat of illegal or improvident management. The majority opinion increases the amount of contract liability to $121,000.00 and includes both income and assets in property covered by the equitable mortgage. The majority opinion then reassuringly states, "None of the burdens of this judgment should be passed on or charged to its ratepayers, but rather borne solely by Topaz."

The logic of this comforting rhetoric must yield to the logic of reality. The record shows that litigation regarding the lien commenced shortly after judgment was entered January 19, 1990, when the legal equivalent of World War III erupted. Marsh served a writ of garnishment on Topaz seeking $174,659.29. Within several weeks, the PSC moved for an order deciding that the funds belonged to the ratepayers. Three days later, the Topaz Ranch Estate Property Owners Association became a participant in the melee, and on April 11, the Attorney General's Office of the Advocate for Customers of Public Utilities entered the fray. The record does not reflect what thereafter happened but presumably a good time was had by all, particularly the lawyers. Maybe the participants are waiting for enlightenment from this court. This is precisely a situation that NRS 704.323 was designed to prevent—and would have done so if it had been properly followed.

The court next turns its attention to the unjust enrichment claim against John and Virgie Arden which was limited by the trial court to a maximum of $10,000.00, the sum received by them from NLA on October 24, 1986.

On October 1, 1986, the Ardens had contracted to sell their holdings to NLA, including the Topaz Ranch upon which foreclosure occurred. By this agreement, NLA was to pay $10,000.00 every thirty days to the Ardens. This $10,000.00 received from NLA was the first of such payments. The Ardens were unaware of the source of the money or of the loan by Marsh to NLA until nearly ten months *after* it was made.

The majority contends that because $87,000.00 was fraudulently used by NLA to prevent foreclosure on a property under contract of sale to NLA, this benefitted the Ardens. The Federal Land Bank, after a several month postponement, foreclosed on the property.

My colleagues suggest that the delay in foreclosure may have somehow benefitted the Ardens because it provided more time to find a buyer. Such a benefit, if quantifiable at all, would have redounded not to the benefit of the Ardens but to NLA which had contracted to purchase the property from the Ardens and assume the encumbrances. The opinion alludes vaguely to other direct and indirect benefits but regrettably does not provide any illumination as to what they are.

It is difficult, from the record, to hold that a jury or court would conclude that the Ardens benefitted by more than $10,000.00—if by that amount. The trial court considered all of the evidence and imposed this limit which has been paid. It would appear there is substantial evidence to support the trial court's judgment, and not being clearly erroneous, I find no basis for reversing and permitting Marsh to have another jury trial to seek more damages for unjust enrichment.

One cannot but feel sympathy for Marsh who was victimized by an unscrupulous confidant and his two greedy associates. Their actions were instinct with fraud; liability was easy to find. However, the liability of Topaz and the Ardens is far less clear. Even the trial judge admitted that evidence of fraud against Topaz was "skimpy." The defendants were entitled to something they did not receive—a fair trial with a properly instructed jury.

The majority opinion was fashioned in part from the jury deliberations, in part from the judgment of the court, and in part from the majority's perceptions. I respectfully submit that the combination of the three parts form the "camel" alluded to, perhaps somewhat irreverently, at the beginning of my dissent.

For reasons stated, I suggest that this judicial camel should be put in a caravan heading back to the lower court for a new trial.