*729 OPINION
By the Court,
Parraguirre, J.:
This appeal and cross-appeal from a district court order in a breach of contract and tort action arising from improper foreclosure proceedings involve several compensatory and punitive damage award issues. With respect to compensatory damages, since respondents/cross-appellants’ actual losses did not exceed the damages that they incurred to their real and personal property, we conclude that they were not entitled to recover separately under breach of contract and negligence theories in addition to theories of trespass and conversion. Moreover, we conclude that the district court inappropriately trebled the jury’s award for trespass and conversion as it relates to personal property. In the remaining portions of the compensatory damages awarded, we perceive no error.
Regarding the punitive damage award, we conclude that the award was supported by substantial evidence, and we affirm the district court’s judgment in that respect. In doing so, we take this opportunity to clarify our punitive damages jurisprudence in light of NRS 42.001. In 1995, the Legislature enacted NRS 42.001, which defines implied malice as a distinct basis for punitive damages in Nevada and establishes a common mental element for implied malice and oppression based on conscious disregard. We now clarify this mental element in accord with its statutory definition and align our jurisprudence with NRS 42.001 in the following two respects. First, we overrule Granite Construction v. Rhyne[1] as a guide to determining the showing required to demonstrate conscious disregard under NRS 42.001(1). Second, we retreat from our past use of the term “unconscionable irresponsibility” to describe the outer limit of culpable conduct that would escape liabil *730 ity for punitive damages in Nevada. Separately, we conclude that NRS 42.007 governs vicarious employer liability for punitive damages and overrule Smith’s Food & Drug Centers v. Bellegarde[2] to the extent that its common law approach conflicts with this statute.

FACTS AND PROCEDURAL HISTORY

This case arose when appellant/cross-respondent Countrywide Home Loans, Inc. (Countrywide), misidentified and foreclosed upon a condominium unit owned by respondents/cross-appellants Gerald and Katrina Thitchener (the Thitcheners) while they temporarily were residing in another state.[3] In the process of preparing the Thitcheners’ unit for resale on the mistaken belief that it belonged to another party, Countrywide completely disposed of the Thitcheners’ personal belongings.
The Thitcheners financed the purchase of their Las Vegas condominium through Countrywide in 1998. In January 2002, Gerald was deployed by the Air National Guard to Tucson, Arizona. In July 2002, Katrina and the Thitcheners’ children joined Gerald in Tucson and the family moved into a rental property.
Because the move was temporary, Katrina left the family’s possessions in their Las Vegas condominium and kept the power on in the unit. In the meantime, the Thitcheners continued to pay their condominium’s utility bills, homeowners’ association dues, and property taxes, and they had their Countrywide mortgage bills forwarded to their Tucson address.
While in Tucson, the Thitcheners missed their mortgage payments for March, April, and May 2002. Their loan was referred to Countrywide’s foreclosure department, and Countrywide requested that its contractor inspect the unit. In June 2002, the Thitcheners brought their loan current, and Countrywide halted its foreclosure proceedings.
Days after the Thitcheners cured their default, Countrywide initiated separate foreclosure proceedings against James Rangel, a condominium owner in the Thitcheners’ complex. Countrywide dispatched its contractor to inspect Rangel’s condominium but did not list Rangel’s unit number, unit 10, on the computer-generated inspection form. Without a listed unit number, the contractor assumed that Countrywide had requested another inspection of unit 118 — the Thitcheners’ unit — and entered that unit number on the inspection form.
*731 Using the Thitcheners’ unit number designated on the inspection form, Countrywide updated its computer records pertaining to Rangel’s loan. Relying on these computer records from this point forward, Countrywide confused the Thitcheners’ unit for Rangel’s and mistakenly prepared it for resale.
To prepare the Thitcheners’ unit, Countrywide asset manager Jennifer Baldwin hired James Standley, a local real estate agent. Standley entered the unit with a locksmith. Inside, he discovered stacks of unopened mail, stray articles of clothing on the floor, food in the refrigerator, and an absence of toiletries and beds. Though the unit’s power was on and it still contained the Thitcheners’ personal effects, Standley determined that the unit was abandoned.
Following his inspection, however, Standley contacted Baldwin to verify that he was marketing the correct unit. Baldwin confirmed that he was and, proceeding on this knowledge, Standley transferred the utilities into his name and hired David Leyba to “trash-out” the premises. According to Standley’s instructions, Leyba apparently stored only those items with replacement value and disposed of them after 30 days. Anything else he discarded.
After removing the Thitcheners’ belongings, Standley learned that the unit’s homeowners’ association dues were current. Concerned, Standley contacted Baldwin a second time. For verification, Baldwin contacted her manager, Dennis Gierula, who referred her to Countrywide’s foreclosure department, which then notified Baldwin that she could proceed. Again, Baldwin confirmed with Standley that he was marketing the correct unit.
Around this time in April 2003, the Thitcheners realized that their utilities were now in Standley’s name, and Countrywide discovered that its records reflected two owners on the title for unit 118: Rangel and the Thitcheners. After meeting with Countrywide’s legal department, Baldwin canceled escrow, asked Standley to inventory the Thitcheners’ possessions from memory, and instructed him to direct any inquiries to Dennis Gierula.
In the meantime, pursuing this matter from Tucson, the Thitcheners contacted neighbors and family, who informed them that their possessions had been removed and a property management company’s sign now hung in their window. The Thitcheners then contacted Standley, who informed them that they were in foreclosure and that Countrywide was preparing to sell their home. After contacting Baldwin, the Thitcheners were referred to Countrywide’s legal department, which did not return their phone calls. Returning to Las Vegas in August 2003, the Thitcheners discovered that their home was empty.
Seeking to recover general and special damages for their real and personal property as well as punitive damages, the Thitcheners sued Countrywide, asserting claims for trespass, conversion, neg *732 ligence, negligence per se, negligent infliction of emotional distress (NIED), breach of contract, and breach of the covenant of good faith and fair dealing. The district court granted judgment as a matter of law against the Thitcheners on their NIED and negligence per se claims. Countrywide conceded liability with respect to the Thitcheners’ remaining claims but contested the Thitcheners’ damages.
After a trial on damages, the jury awarded the Thitcheners a total of $922,690 in general and special damages, which included $322,690 for trespass and conversion, and awarded $2,500,000 in punitive damages. Following the verdict, the district court trebled the amount of compensatory damages awarded for trespass and conversion, awarded the Thitcheners prejudgment interest on the overall compensatory damage award, in addition to attorney fees and costs, and ordered post-judgment interest to run at a rate of 8.25 percent on the entire judgment principal.
Countrywide moved for remittitur. The district court partially granted the motion and capped the amount of punitive damages at three times the untrebled amount of the Thitcheners’ trespass and conversion damages, reducing the punitive damage award to $968,070. The district court denied all of Countrywide’s separate challenges and entered final judgment for the Thitcheners totaling $3,077,057.50.
Countrywide appeals, arguing that several errors rendered the compensatory and punitive damage awards excessive. The Thitcheners cross-appeal, asserting that the punitive damage award should not have been remitted and their NIED and negligence per se claims should have been presented to the jury.[4]

DISCUSSION

Compensatory damages

The jury awarded the Thitcheners $1,000 for trespass and conversion to real property; $321,690 for trespass and conversion to personal property; $300,000 for Countrywide’s negligence; and $300,000 for breach of contract, which included damages for the breach of the covenant of good faith and fair dealing. Following the jury’s verdict, the district court trebled the Thitcheners’ trespass and conversion damages, bringing the total compensatory damage award from $922,690 to $1,568,070. Countrywide challenges this award, arguing that (1) portions of it are duplicative, (2) the damages awarded for conversion were improperly trebled, and (3) the amount of special damages awarded for the Thitcheners’ lost be *733 longings is excessive. We address each of Countrywide’s arguments in turn.

Duplicative awards

Countrywide contends that each of the $300,000 awards for breach of contract and negligence duplicated the amount awarded for trespass and conversion and thus the total compensatory damage award exceeded the Thitcheners’ total losses. We agree.
While plaintiffs are permitted to plead alternative or different theories of relief based on the same facts, plaintiffs may not recover more than their “total loss plus any punitive damages assessed.’ ’[5] Here, although the verdict form instructed the jury to “award the total amount of the Plaintiffs’ damages without awarding any duplicative damages” and contained separate categories of damages corresponding to each of the Thitcheners’ surviving claims — breach of contract, negligence, trespass, and conversion— the record shows that the jury failed to heed this instruction.
With respect to their breach of contract claim, the Thitcheners were required to present “an evidentiary basis for determining a reasonably accurate amount of damages.”[6] Notably, however, the record does not support a finding of economic losses flowing from breach of the contract at issue here — the loan agreement — that were distinct from the property damages in this case.[7] Similarly, with regard to their negligence claim, because the scope of the Thitcheners’ actual damages did not extend beyond damages to property, the jury lacked an independent basis to assess additional damages for Countrywide’s negligence.[8]
Because no physical harm occurred in this case and the Thitcheners’ NIED claim failed as a matter of law, personal injury damages and emotional impact damages were not before the jury. On the Thitcheners’ trespass and conversion claims, the jury awarded $1,000 for damages to real property and $321,690 for damages to personal property. Since these damages exhausted the potential recovery in this case, we conclude that the Thitcheners were not en *734 titled to recover damages separately under their breach of contract and negligence claims.[9]

Trebled damages to personal property

Countrywide contends that the district court improperly applied NRS 40.170 to treble the $321,690 in damages awarded for trespass and conversion to personal property because that statute applies only to actual damages to real property. Reviewing this issue de novo,[10] we agree.
NRS 40.170 provides the following:
If a person recover[s] damages for a forcible or unlawful entry in or upon, or detention of, any building or any uncultivated or cultivated real property, judgment may be entered for three times the amount at which the actual damages are assessed.
Although we generally look no further than its plain language when determining a statute’s meaning, when a statute may be interpreted in more than one reasonable manner, the statute is ambiguous, and we will resort to rules of statutory interpretation to effect a construction that reflects the Legislature’s intent.[11]
Because NRS 40.170 does not differentiate between damages to real and personal property, the Thitcheners argue on appeal as they did below that the statute permits the trebling of personal property damages that “arise out of” a trespass. Agreeing with this position, the district court trebled the personal property damages on the Thitcheners’ trespass and conversion claims, noting that it was doing so “because the conversion [of the Thitcheners’ personal property] is related to the trespass.” By contrast, Countrywide argues that NRS 40.170 applies exclusively to treble damages to real property.
In view of these competing interpretations, both of which are reasonable, NRS 40.170 is ambiguous. For the following reasons, however, we conclude that NRS 40.170 applies to treble actual damages only to real property. First, NRS Chapter 40 applies exclusively to real property disputes and NRS 40.170 resides under the section heading “Actions for Nuisance, Waste and Willful Tres *735 pass on Real Property.”[12] Second, it is reasonable to presume that NRS 40.170 was intended to enhance recovery in actions for trespass to real property because actual damages in such cases are typically nominal or difficult to assess.[13] Accordingly, since NRS 40.170 applies to treble actual damages only to real property, the Thitcheners’ personal property damages should be reduced to $321,690 and the trebled award in this case limited to $3,000-three times the amount of actual damages the jury awarded for the Thitcheners’ real property.[14]

Special damages award

Countrywide argues that the jury’s award of special damages was excessive, based on the district court’s failure to give its proposed jury instruction on special value. Because of this, Countrywide asserts that the amount of special damages awarded for the Thitcheners’ irreplaceable but nonmarketable property was not supported by the record. We disagree. The district court has broad discretion to settle jury instructions, and its decision to give or decline a par *736 ticular instruction will not be overturned absent an abuse of discretion or judicial error.[15]
According to the Restatement (Second) of Torts § 911, when converted property’s value to the owner exceeds its market value, the owner may be compensated for its special value, which is measured by “factors apart from those entering into exchange value that cause the article to be more desirable to the owner than to others.”[16] With respect to irreplaceable property, these factors include, among other rational measures of value, the property’s original cost, the quality and condition of the property at the time of the loss, and the cost of reproduction, but exclude subjective considerations of sentimental value.[17] Because it ensures that the amount of special damages will be objectively assessed, and thereby accords with a plaintiff’s burden to present competent evidence to support a reasonably accurate amount of damages,[18] we adopt the Restatement’s valuation method for irreplaceable property.
Here, the district court gave the following jury instruction on special value: ‘ ‘Where there is the destruction of personal property without a market value, it does not mean the property is valueless and that damages cannot be recovered by the plaintiff, rather, plaintiff is entitled to damages based upon the property’s special value to the plaintiff.” By contrast, Countrywide’s jury instruction would have prohibited the jury from considering the property’s sentimental value, and would have directed it to consider only “the value of the lost or damaged personal property to the [Thitcheners].”
While Countrywide’s proposed instruction on special value was correct as far as it went, it was incomplete because it failed to explicitly differentiate between special value and ordinary market value. As such, it approximated an instruction on actual damages, *737 which could have inappropriately constrained the jury to awarding the Thitcheners the mere exchange value of their irreplaceable possessions.[19] Moreover, while the district court’s jury instruction properly distinguished between special value and market value, it failed to restrict the jury from attempting to monetize the Thitcheners’ sentimental attachment to their property. Both the district court’s instruction and Countrywide’s proposed instruction, therefore, were incomplete in their own regard. However, neither of the instructions necessarily misstated the law. Thus, we do not perceive any abuse of discretion in the district court’s decision to refuse Countrywide’s proposed jury instruction in favor of the instruction that was ultimately submitted to the jury.
Alternatively, Countrywide argues that there was insufficient evidence that the Thitcheners’ irreplaceable possessions had enough special value to support the $321,690 award of special damages. We disagree. Since special damages are a species of compensatory damages, a jury has wide latitude in awarding them.[20] So long as there is an evidentiary basis for determining an amount that is reasonably accurate, the amount of special damages need not be mathematically exact.[21]
At trial, the Thitcheners testified that they would not sell certain irreplaceable possessions that were lost in the “trash-out” regardless of the amount offered. While this testimony alone is legally insufficient as a measure of special value,[22] the Thitcheners introduced a list of their irreplaceable possessions. Among other things, the list included Gerald Thitchener’s military medals, certificates, and commendations, as well as other tangible markers of Gerald and Katrina’s personal achievements, a portrait of a deceased parent, autographed memorabilia, various heirlooms, and family photos and video footage, which cannot be reproduced. Although the jury was not given an exact measure for determining the special value of these possessions, we cannot conclude that the award of $321,690 in special damages was based on improper considerations of sentimental value.
*738 As Countrywide points out, some rational measures of special value are ‘“the difficulty and expense to which [a] plaintiff was put in acquiring the property’ and ‘the nature and character of [its] use.’ ’ ’[23] In this case, viewing the evidence as a whole in the light most favorable to the verdict,[24] the jury was presented with facts allowing it to dispassionately evaluate the time and resources that the Thitcheners invested in acquiring their irreplaceable possessions, and therefore the jury had a lawful measure by which to determine the reasonable special value of the property. Thus, a sufficient evidentiary basis supports the $321,690 award of special damages. Accordingly, although they are not entitled to recover separately on their claims for breach of contract and negligence, and while the amount of damages for the conversion of the Thitcheners’ personal property was improperly trebled, the remaining amounts of compensatory damages, both general and special, were properly awarded.[25]

Punitive damages

After the jury returned a verdict awarding the Thitcheners $2,500,000 in punitive damages, Countrywide moved to remit the award, arguing that it was excessive due to several errors. The district court granted the motion in part, remitting the punitive dam *739 age award to $968,070 in accordance with NRS 42.005(l)(a).[26] The district court entered an amended judgment on the reduced award, from which Countrywide appeals. On appeal, Countrywide challenges the propriety of this award, arguing that the Thitcheners failed to demonstrate by clear and convincing evidence that it was guilty of implied malice or oppression as required to justify an award of punitive damages under NRS 42.005(1). As explained below, we disagree.

Standard of review

An award of punitive damages will not be overturned if it is supported by substantial evidence of implied malice or oppression.[27] “ ‘Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion.’ ”[28] In reviewing a jury’s punitive damage award, we “ ‘assume that the jury believed all [of] the evidence favorable to the prevailing party and drew all reasonable inferences in [that party’s] favor.’ ’ ’[29]
Under NRS 42.001, “‘[mjalice, express or implied’ means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others.”[30] Similarly, ‘“[oppression’ means despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person.”[31] Both definitions utilize conscious disregard of a person’s rights as a common mental element, which in turn is defined as “the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences.”[32]

Conscious disregard of the Thitcheners’ rights

Punitive damages are designed to punish and deter a defendant’s culpable conduct and act as a means for the community to express outrage and distaste for such conduct.[33] Before punitive damages may be recovered, NRS 42.005(1) requires clear and *740 convincing evidence of either implied malice or oppression. Once the district court makes a threshold determination that a defendant’s conduct is subject to this form of civil punishment, the decision to award punitive damages rests entirely within the jury’s discretion.[34]
In this case, the district court determined that punitive damages were available and submitted the issue to the jury based on evidence that Countrywide ignored numerous warning signs that likely would have led it to discover its error in misidentifying the Thitcheners’ condominium unit before it disposed of the Thitcheners’ personal belongings and listed their unit for sale. Finding that there was clear and convincing evidence that Countrywide consciously disregarded the Thitcheners’ rights, the jury awarded punitive damages on alternative theories of implied malice and oppression.
NRS 42.001, which was enacted in 1995, accomplished the following two important changes in Nevada’s punitive damages framework. First, NRS 42.001 clarifies that implied malice is a basis for punitive damages independent of express malice. Second, NRS 42.001 defines conscious disregard, an element of both implied malice and oppression, which previously had not been defined by statute.
Here, Countrywide argues that the Thitcheners failed to prove that it consciously disregarded their rights because there was no direct evidence that it actually knew that it was proceeding against the wrong condominium unit. In response, the Thitcheners argue that Countrywide knew that it might have misidentified the Thitcheners’ unit while handling Rangel’s foreclosure due to numerous “red flags,” but willfully and deliberately failed to act to avoid the consequences of its mistake by neglecting to adequately investigate these warning signs.
We have never formally addressed what conduct amounts to conscious disregard under NRS 42.001 and NRS 42.005, as necessary to demonstrate implied malice or oppression for purposes of punitive damages. Before NRS 42.001 was enacted in 1995, conscious disregard for a person’s rights or safety, as the mental element necessary to demonstrate implied malice, was analyzed in any depth in Nevada only twice: first in Craigo v. Circus-Circus Enterprises[35] and later in Granite Construction v. Rhyne.[36]
In both of these cases, a divided court vigorously disputed the meaning of “malice, express or implied” under former NRS 42.010. Enacted in 1965, former NRS 42.010 tracked the punitive *741 damage statute of California as it existed at that time.[37] Presuming that it was therefore derived from California’s statute, the judicial gloss on California’s statute was imported into our jurisprudence as the standard construction of “malice, express or implied” under former NRS 42.010. According to the California Supreme Court in Davis v. Hearst,[38] and our later cases following the reasoning of that decision,[39] the phrase “malice, express or implied” meant only “malice in fact,” a construction which relegated the disjunctive “express or implied” to refer merely “ ‘to the evidence by which that malice is established.’ ”[40] Reading our decisional law to endorse the view of former NRS 42.010 to require proof of malice in fact, Justice Steffen — writing for a two-justice plurality in Craigo and in his dissenting opinion in Granite — argued that punitive damages were therefore restricted to those limited instances in which a plaintiff could demonstrate that the defendant harbored a “ ‘deliberate intention to injure.’ ”[41]
In his concurring opinion in Craigo, however, Justice Springer viewed former NRS 42.010 differently. Citing Leslie v. Jones Chemical Co.[42] and Nevada Cement Co. v. Lemler[43] in which awards of punitive damages were upheld absent facts demonstrating a deliberate intention to injure, Justice Springer reasoned that our jurisprudence had evolved beyond the restrictions of the Davis gloss to recognize implied malice, which, in his view, gave substantive meaning to former NRS 42.010’s language permitting the recovery of punitive damages for “malice, express or implied.”[44] *742 After recognizing in this way that implied malice had become a discrete basis for recovering punitive damages in Nevada, Justice Springer, by grounding implied malice in a theory of conscious disregard, undertook to reconcile the hopeless disharmony that historically had plagued attempts to define this form of malice in an instructive way for lower courts.[45]
Notably, however, the application of Justice Springer’s approach to implied malice produced results that were seemingly at odds with his definition of conscious disregard.[46] Under his approach, the plaintiff was required to show that the defendant acted dangerously, knowing that harm to someone would probably follow.[47] Yet, in Craigo, Justice Springer concurred in the decision of the two-justice plurality to reverse an award of punitive damages based on implied malice despite evidence that casino management apparently knew, from past occurrences of crime, that failing to increase parking garage security would endanger those who parked there.[48] His Craigo concurrence notwithstanding, leading a three-justice majority one year later in Granite, Justice Springer upheld an award of punitive damages for implied malice on an arguably similar set of facts under the same approach.
In light of the discord noted above and given NRS 42.001(l)’s clear definition, we conclude that neither Granite nor the Craigo concurrence remain appropriate guides to analyzing conscious disregard for purposes of implied malice or oppression.[49] In short, the enactment of NRS 42.001 has retired the malice debate and clarified the proper role of a defendant’s conscious disregard in our law of punitive damages. Under NRS 42.001, implied malice is a discrete basis for assessing punitive damages where conscious disre *743 gard can be demonstrated.[50] To eliminate confusion regarding this mental element, the Legislature defined conscious disregard under NRS 42.001(1) in plain and unambiguous terms. Rather than rely on past cases that pre-dated NRS 42.001(1), in defining what conduct would amount to conscious disregard, we look no further than the statute’s language. Since its language plainly requires evidence that a defendant acted with a culpable state of mind, we conclude that NRS 42.001(1) denotes conduct that, at a minimum, must exceed mere recklessness or gross negligence.[51]
As part of this conclusion, we expressly retreat from our past use of the term “unconscionable irresponsibility” to describe the outer limit of culpable conduct that is immune from civil punishment in Nevada. In First Interstate Bank v. Jafbros Auto Body, we stated that “even unconscionable irresponsibility will not support a punitive damages award.”[52] Although this cryptic term later evolved into somewhat of a touchstone in our punitive damages jurisprudence, it originated in dicta[53] and lacks a firm basis in the law. Moreover, because of its imprecision, the term is incompatible with the Legislature’s — as well as our own — recent efforts to move toward greater uniformity in the area of punitive damages. For these reasons, we abandon this terminology.

Punitive damages were not improper

We next consider Countrywide’s argument that punitive damages were improperly submitted to the jury because there was insufficient evidence for the jury to infer that it acted with conscious disregard for the Thitcheners’ rights. In light of the new alignment in *744 our punitive damage jurisprudence discussed above, we cannot agree.
In this case, the Thitcheners presented evidence of multiple ignored warning signs suggesting that Countrywide knew of a potential mix-up, as well as evidence indicating that Countrywide continued to proceed with the foreclosure despite knowing of the probable harmful consequences of doing so. The Thitcheners appeared as owners of the condominium unit in several documents in Rangel’s foreclosure file, including an appraisal report, a broker price opinion, and a preliminary title report. By her own admission, Baldwin reviewed the appraisal report, understood that the Thitcheners owned this property, but did not consider this to be problematic in preparing the property for resale. Baldwin was similarly indifferent regarding the broker price opinion, which she also admittedly ignored. Although the preliminary title report was available for this property, Baldwin did not review it, leaving that task to a subordinate. What is more, Countrywide’s realtor twice directly notified Baldwin that there was a potential mix-up. After the second time, Baldwin e-mailed an unidentified person in Countrywide’s foreclosure department, who notified her that she could proceed. Countrywide, however, could not produce Baldwin’s e-mail, nor could it produce the unidentified person from its foreclosure department who gave her this assurance.[54] Based on the above, there was sufficient evidence to infer that Countrywide knew that it may have been proceeding against the wrong unit.[55]
Moreover, as a foreclosure specialist, Baldwin presumably understood that proceeding in the face of these warning signs involved an imminent, as opposed to merely a theoretical, risk of harm to this particular unit’s lawful owner. Given this knowledge of the probable harm that would result from a wrongful foreclosure, the jury reasonably could have inferred that Countrywide’s casual attempts at verification indicated a willful and deliberate failure on its part to avoid that harm. Consequently, the jury could have logically concluded that Countrywide consciously disregarded the *745 Thitcheners’ rights.[56] As these and other reasonable inferences could have been drawn in the Thitcheners’ favor, we cannot conclude that submitting the Thitcheners’ punitive damage claim to the jury was improper.[57]
Separately, Countrywide argues that the amount of punitive damages awarded in this case is excessive. We disagree. Applying the statutory cap under NRS 42.005(l)(a), the district court remitted the jury’s original punitive damage award of $2,500,000 to $968,070, three times the untrebled amount of the Thitcheners’ trespass and conversion damages. Reviewing this reduced award under the due process guideposts adopted in Bongiovi v. Sullivan, we conclude that $968,070 was not unreasonable or clearly disproportionate to the amount of harm suffered by the Thitcheners or to the compensatory damage award.[58]

Vicarious corporate liability for punitive damages

Countrywide contends that instructing the jury under Smith’s Food & Drug Centers v. Bellegarde[59] instead of NRS 42.007 requires reversal of the Thitcheners’ punitive damage award since the approach to vicarious employer liability for punitive damages adopted in Bellegarde is less stringent than the statutory standard. Although we agree that NRS 42.007 controls the question of vicarious employer liability for punitive damages in Nevada, and *746 therefore overrule Bellegarde in this respect, we disagree that reversal is required under these circumstances.
At trial, the Thitcheners argued that Countrywide was subject to punitive damages on the theory that it was vicariously liable for Baldwin’s conduct. The Thitcheners then requested and received an instruction based on the complicity rule of the Restatement (Second) of Torts § 909 that we adopted in Bellegarde with regard to an employer’s vicarious liability for punitive damages for the acts or omissions of its agents.[60] Countrywide objected to this instruction and proposed a competing instruction based on NRS 42.007.
Enacted in 1995, NRS 42.007 was intended to limit employers’ pure vicarious liability for the wrongful acts of employees committed within the scope of employment.[61] Under NRS 42.007’s three alternative theories, an employer may be liable for punitive damages based on an employee’s wrongful acts if:
(a) The employer had advance knowledge that the employee was unfit for the purposes of the employment and employed him with a conscious disregard of the rights or safety of others;
(b) The employer expressly authorized or ratified the wrongful act of the employee for which the damages are awarded; or
(c) The employer is personally guilty of oppression, fraud or malice, express or implied.
In this way, NRS 42.007 ensures that employers are subject to punitive damages only for their own culpable conduct and not for the misconduct of lower level employees.[62]
*747 Although NRS 42.007 and the complicity rule adopted in Bellegarde both reflect a conservative approach to vicarious employer liability for punitive damages,[63] we recognize that Bellegarde and NRS 42.007 represent two parallel theories of recovery. Although similar in other respects, unlike Bellegarde, NRS 42.007 is confined to employment relationships. We therefore clarify that NRS 42.007 is the controlling standard in Nevada regarding vicarious employer liability for punitive damages for the acts or omissions of employees.[64] Accordingly, the district court abused its discretion in instructing the jury under Bellegarde’s complicity rule instead of the statutory standard.
Nevertheless, we conclude that this instructional error does not require reversal, since the jury reasonably could have determined under NRS 42.007 that Baldwin’s conduct was imputable to Countrywide.[65] As noted above, under NRS 42.007, an employer can be vicariously liable for punitive damages if, among other reasons, the employer expressly authorized or ratified the employee’s wrongful conduct or the employer is personally guilty of oppression, fraud, or malice, express or implied. When the employer is a corporation, however, the authorization, ratification, or oppression, fraud, or malice must be accomplished by an “officer, director, or managing agent of the corporation who was expressly authorized to direct or ratify the employee’s conduct.” Although NRS 42.007 fails to define a managing agent, we previously have recognized that determining an individual’s managerial capacity depends on “what the individual is authorized to do by the principal and whether the agent has the discretion as to what is done and how it is done.”[66]
In this case, Baldwin was a Countrywide “asset manager.” Although her title is not dispositive,[67] Baldwin testified that she oversaw a large portfolio of foreclosures located across the United *748 States. In managing her portfolio, Baldwin further testified that she was authorized to hire listing agents and negotiate sales prices with prospective buyers. Notably, however, before this incident, Countrywide had no internal policies governing the proper identification of foreclosed properties, the selection of listing agents, or the appropriate handling of abandoned property. Thus, because she largely was unconstrained by corporate protocols, the jury reasonably could have concluded that Baldwin possessed the discretion to create and implement policies with respect to the properties in her own portfolio, which included the Thitcheners’ condominium unit.[68]
Having concluded that Baldwin was a managing agent for purposes of NRS 42.007, the jury further could have determined that Baldwin authorized or ratified Standley’s conduct, as Baldwin was responsible for hiring Standley to prepare the Thitcheners’ condominium unit for resale and directed him on two occasions to proceed with the “trash-out” despite Standley’s misgivings. Likewise, the jury could have determined that Baldwin was personally guilty of implied malice or oppression based on, among other things, evidence supporting a pattern of ignoring Standley’s concerns, a tendency to brush off the discrepancies in Rangel’s foreclosure file, and a patent failure to see the obvious. As it could have drawn these inferences from the evidence presented, the jury reasonably could have determined under NRS 42.007 that Baldwin’s conduct was imputable to Countrywide for purposes of punitive damages. Accordingly, we consider giving the Bellegarde instruction to be harmless.

The Thitcheners’ cross-appeal

On cross-appeal, the Thitcheners raise two arguments. First, they argue that the district court improperly entered judgment as a matter of law under NRCP 50(a) on their NIED and negligence per se claims. Viewing the evidence and all inferences in the Thitcheners’ favor, we disagree. Indeed, we eliminated NIED claims based on damage to property in Smith v. Clough,[69] and the Thitcheners have not demonstrated that the statutes at issue in this case— NRS 206.040 (illegal entry); NRS 206.310 (property damage); NRS 205.067 (home invasion); and NRS 118A.460 (disposal procedures for abandoned personal property) — are proper predicates for negligence per se.[70] Thus, because their claims cannot be maintained under controlling law, judgment in Countrywide’s favor *749 under NRCP 50(a) was appropriate. Second, the Thitcheners argue that the jury’s original $2,500,000 punitive damage award should be reinstated. However, since that amount exceeds three times the Thitcheners’ actual damages after appeal ($322,690), the Thitcheners’ request is meritless.[71]

CONCLUSION

Based on the above, we affirm the district court’s judgment as to the punitive damage award of $968,070. However, because the Thitcheners were not entitled to recover compensatory damages beyond those awarded on their claims for trespass and conversion, we reverse the judgment as it pertains to the damages awarded on their claims for breach of contract and negligence. Furthermore, while we affirm the $3,000 award in the judgment for trespass to real property, we conclude that the personal property damages on the Thitcheners’ conversion claim were improperly trebled and reverse the judgment as to those damages. Based on the above, we remand this matter to the district court with instructions to amend its judgment to reduce the Thitcheners’ personal property damages as set forth in this opinion and to allow for a non-duplicative award on all theories of recovery. The district court’s awards of pre- and post-judgment interest should be adjusted accordingly.[72]
Gibbons, C. J., Maupin, Hardesty, Douglas, Cherry and Saitta, JJ., concur.

 107 Nev. 651, 817 P.2d 711 (1991).

 114 Nev. 602, 610, 958 P.2d 1208, 1214 (1998) (adopting the complicity approach of the Restatement (Second) of Torts § 909 (1977) with regard to the punitive damage liability of employers for the acts or omissions of their agents).

 Respondents/cross-appellants Steven Lamb and Kaitlyn Thitchener, the Thitcheners’ children, were minors at the time when the underlying suit was initiated.

Since the Thitcheners’ NIED and negligence per se claims were formally resolved by a written stipulation and order of dismissal entered after the district court amended its judgment upon the jury verdicts, that order constitutes the final appealable judgment in this case. See NRAP 3A(b)(l); Lee v. GNLV Corp., 116 Nev. 424, 996 P.2d 416 (2000).

Topaz Mutual Co. v. Marsh, 108 Nev. 845, 852, 839 P.2d 606, 610 (1992).

Mort Wallin v. Commercial Cabinet, 105 Nev. 855, 857, 784 P.2d 954, 955 (1989).

See Dalton Properties, Inc. v. Jones, 100 Nev. 422, 424, 683 P.2d 30, 31 (1984) (“The object of compensatory damages in an action for breach of contract is merely to place the injured party in the position that he would have been in had the contract not been breached.”).

See Prabhu v. Levine, 112 Nev. 1538, 1550, 930 P.2d 103, 111 (1996) (indicating that although juries have wide latitude to award tort damages, awards must he supported by the evidence).

See Colorado Environments v. Valley Grading, 105 Nev. 464, 472, 779 P.2d 80, 84-85 (1989) (striking an award for equipment standby damages in a contract action by the amount that it exceeded the plaintiff’s actual lost profits and costs).

Westpark Owners’ Ass'n v. Dist. Ct., 123 Nev. 349, 357, 167 P.3d 421, 426-27 (2007).

d. at 357, 167 P.3d at 427.

 See Coast Hotels v. State, Labor Comm’n, 117 Nev. 835, 841-42, 34 P.3d 546, 551 (2001) (noting that the title of a statute may be considered in determining legislative intent).

 Cf. Hale v. Warren, 236 S.W.3d 687, 695 (Mo. Ct. App. 2007) (recognizing that statutory actions for trespass are intended to redress intangible injuries whose damages are not easily quantifiable). Indeed, had the Legislature intended to multiply damages for trespass to personal property, similar to other jurisdictions, it could have done so explicitly. See, e.g., Mo. Ann. Stat. § 537.330 (West 2008) (doubling damages for trespass to personalty); Minn. Stat. Ann. § 548.05 (West 2000) (trebling damages for trespass to personal property grown upon land).

 Countrywide also argues that NRS 40.170 creates a penalty and, therefore, subjecting it to treble damages in addition to punitive damages would amount to double recovery as well as impermissibly punish it twice for the same in jury. However, since the trespass damages to the Thitcheners’ condominium unit and the damages for converting the Thitcheners’ personal belongings were the result of distinct acts, the award of punitive damages in this case did not amount to double recovery. Instead, punitive damages were available based on the conduct underlying the Thitcheners’ conversion claim. See Bumgarner v. Bumgarner, 862 P.2d 321, 335 (Idaho Ct. App. 1993). Moreover, since NRS 40.170 lacks a mental element, it is not concerned on its face with penalizing a defendant’s conscious wrongdoing. See Bullman v. D & R Lumber Co., 464 S.E.2d 771, 776 (W. Va. 1995). By virtue of its indifference to mens rea, this general intent statute requires a lower threshold of conduct than do statutes allowing for punitive damages. Therefore, NRS 40.170 is designed to achieve social objectives that are distinct from punishment and deterrence. See MTA v. Superior Court, 20 Cal. Rptr. 3d 92, 96 (Ct. App. 2004). Although we recognize that the label is somewhat imperfect, we conclude that the purpose of NRS 40.170 is compensatory (as opposed to penal). Accordingly, we conclude in this case that the awards of treble and punitive damages were not cumulative punishments.

 Skender v. Brunsonbuilt Constr. & Dev. Co., 122 Nev. 1430, 1435, 148 P.3d 710, 714 (2006) (“An abuse of discretion occurs if the district court’s decision is arbitrary or capricious or if it exceeds the bounds of law or reason.”).

 Restatement (Second) of Torts § 911 cmt. e (1979).

 Id.; see Landers v. Municipality of Anchorage, 915 P.2d 614, 618 (Alaska 1996) (explaining that an irreplaceable item’s special value under § 911 may be based on such things as original cost or cost to reproduce). As the illustrations in § 911, comment e, demonstrate, special value is a measure of compensatory damages designed to allow a plaintiff to recover for the personal time and effort invested in acquiring or producing an item “or necessary to spend to reproduce it,” even if the market would not normally reward that investment.

See Mort Wallin v. Commercial Cabinet, 105 Nev. 855, 857, 784 P.2d 954, 955 (1989).

See Restatement (Second) of Torts § 911 cmt. e (1979) (noting that where irreplaceable but nonmarketable articles have special value “it would be unjust to limit the damages for destroying or harming the articles to the exchange value”).

See Quintero v. McDonald, 116 Nev. 1181, 1183, 14 P.3d 522, 523 (2000).

Mort Wallin, 105 Nev. at 857, 784 P.2d at 955.

See Campins v. Capels, 461 N.E.2d 712, 722 n.2 (Ind. Ct. App. 1984) (speculative responses to hypothetical offers to sell generally are not enough to support a determination of special value).

Robinson v. U.S., 175 F. Supp. 2d 1215, 1232 (E.D. Cal. 2001) (quoting Willard v. Valley Gas & Fuel Co., 151 P. 286, 290 (Cal. 1915) (Sloss, J., concurring), overruled in part on other grounds by Showalter v. Western R. Co., 106 P.2d 895, 898 (Cal. 1940)) (recognizing that the special value of unique property must be rationally determined under some logical framework).

See Quintero, 116 Nev. at 1183, 14 P.3d at 523 (this court is not at liberty to weigh the evidence anew on appeal and will draw all favorable inferences towards the prevailing party); see also Ladeas v. Carter, 845 S.W.2d 45, 53-54 (Mo. Ct. App. 1992) (noting that a jury must determine the special value of unique property in light of all the facts and circumstances in evidence).

Countrywide also argues that the jury’s $321,690 award was excessive based on certain references by the Thitcheners’ attorney to emotional damages and suggestions of Countrywide’s wealth, arrogance, and remorselessness. At trial, Countrywide objected to the emotional damages reference, which was overruled, but let the remaining comments pass without objection. Following trial, the district court denied Countrywide’s motion for a new trial based on the “permeation” rule in Barrett v. Baird, 111 Nev. 1496, 1515, 908 P.2d 689, 702 (1995), overruled by Lioce v. Cohen, 124 Nev. 1, 17, 174 P.3d 970, 980 (2008). Reviewing these comments de novo, we conclude that none requires reversal under the standards for objected-to but unadmonished misconduct and unobjected-to misconduct, since it is not evident that the jury’s $321,690 award would have been different had it not been exposed to the challenged remarks. See Lioce, 124 Nev. at 18-19, 174 P.3d at 981-82. Thus, we conclude that the district court did not abuse its discretion in denying Countrywide’s motion for a new trial. See id. at 24, 174 P.3d at 985 (affirming the decision to deny a motion for a new trial even though it was reached under the overruled standard).

NRS 42.005(l)(a) provides that a punitive damages award “may not exceed . . . [t]hree times the amount of compensatory damages awarded to the plaintiff if the amount of compensatory damages is $100,000 or more.”

Bongiovi v. Sullivan, 122 Nev. 556, 581, 138 P.3d 433, 451 (2006).

Id. (quoting First Interstate Bank v. Jafbros Auto Body, 106 Nev. 54, 56, 787 P.2d 765, 767 (1990)).

Id. (quoting Jafbros Auto Body, 106 Nev. at 56, 787 P.2d at 767).

NRS 42.001(3) (emphasis added).

NRS 42.001(4) (emphasis added).

NRS 42.001(1).

Bongiovi, 122 Nev. at 580, 138 P.3d at 450.

Evans v. Dean Witter Reynolds, Inc., 116 Nev. 598, 612, 5 P.3d 1043, 1052 (2000).

 106 Nev. 1, 786 P.2d 22 (1990).

 107 Nev. 651, 817 P.2d 711 (1991).

 See Nevada Credit Rating Bur. v. Williams, 88 Nev. 601, 609-10, 503 P.2d 9, 14 (1972).

 116 P. 530 (Cal. 1911).

 See, e.g., Craigo, 106 Nev. at 3-6, 786 P.2d at 23-25; Jeep Corporation v. Murray, 101 Nev. 640, 650, 708 P.2d 297, 304 (1985); Warmbrodt v. Blanchard, 100 Nev. 703, 709, 692 P.2d 1282, 1286 (1984); Wickliffe v. Fletcher Jones of Las Vegas, 99 Nev. 353, 356, 661 P.2d 1295, 1297 (1983); Bader v. Cerri, 96 Nev. 352, 359, 609 P.2d 314, 318 (1980), overruled on other grounds by Evans, 116 Nev. at 608, 611, 5 P.3d at 1050, 1051; Kelly Broadcasting v. Sovereign Broadcast, 96 Nev. 188, 194, 606 P.2d 1089, 1093 (1980); Sanguinetti v. Strecker, 94 Nev. 200, 211-12, 577 P.2d 404, 411-12 (1978); Leslie v. Jones Chemical Co., 92 Nev. 391, 394, 551 P.2d 234, 235 (1976); Caple v. Raynel Campers, Inc., 90 Nev. 341, 344, 526 P.2d 334, 336 (1974); Village Development Co. v. Filice, 90 Nev. 305, 315, 526 P.2d 83, 89 (1974); Nevada Cement Co. v. Lemler, 89 Nev. 447, 451, 514 P.2d 1180, 1182-83 (1973); Nevada Credit Rating Bur., 88 Nev. at 609-10, 503 P.2d at 14.

 Craigo, 106 Nev. at 3, 786 P.2d at 23 (quoting Davis, 116 P. at 539).

 Coughlin v. Tailhook Ass’n, 112 F.3d 1052, 1056 (9th Cir. 1997) (quoting Craigo, 106 Nev. at 9, 786 P.2d at 27).

 92 Nev. 391, 394, 551 P.2d 234, 235 (1976).

 89 Nev. 447, 451, 514 P.2d 1180, 1182-83 (1973).

 Craigo, 106 Nev. at 11-12, 786 P.2d at 28-30 (Springer, J., concurring).

 Id. at 12 n.l, 14-17, 786 P.2d at 29 n.l, 30-31 (Springer, J., concurring). The imprecise and varying terminology used to describe implied malice abounds. In Leslie, implied malice was characterized as “a disregard of known safety procedures.” 92 Nev. at 394, 551 P.2d at 235. In Lemler, it was equated with conduct that was “willful, intentional, and done in reckless disregard of its possible results.” 89 Nev. at 451-52, 514 P.2d at 1183 (internal quotation marks omitted). Adding to the confusion, implied malice mistakenly has been perceived to be synonymous with wanton, willful, reckless, grossly negligent, or indifferent conduct when, in feet, these terms are far from fungible. See Smith v. Wade, 461 U.S. 30, 39-42 (1983).

 Craigo, 106 Nev. at 16, 786 P.2d at 31 (Springer, J., concurring) (defining conscious disregard as the “conscious taking of excessive risks at the expense of injury to others”).

 Id. at 11-12, 786 P.2d at 29-30 (Springer, J., concurring).

 Id. at 20-21, 786 P.2d at 35 (Springer, J., concurring).

 Since Justice Springer derived his notion of conscious disregard from Leslie and Lemler, and, to a lesser degree, Village Development Co. v. Filice, 90 Nev. 305, 315, 526 P.2d 83, 89 (1974), we overrule these cases to the extent that they purport to exemplify the type of evidence by which the current statutory definition of conscious disregard is established.

NRS 42.001(3).

In reaching this conclusion, we cannot proceed without addressing our decision in Maduike v. Agency Rent-A-Car, 114 Nev. 1, 953 P.2d 24 (1998), which has led to some perceived dissonance in the state of our authorities on this issue. See White v. Ford Motor Co., 312 P.3d 998, 1011-12 (9th Cir. 2002). In Maduike, we affirmed the involuntary dismissal of a claim seeking punitive damages on a theory of oppression that was brought against a rental car agency that refused to repair or replace a defective vehicle that it knew to be dangerous. 114 Nev. at 5-6, 953 P.2d at 26-27. Although the Maduike court determined that the evidence failed to satisfy NRS 42.001(4)’s definition of oppression, it summarily applied that definition to the facts and paid cursory attention to evidence supporting the appellants’ arguments concerning the agency’s apparent conscious disregard for their safety. As a result, the decision fails to clearly reveal whether the dismissal of the appellants’ request for punitive damages was affirmed because the hardship suffered was insufficiently “cruel or unjust” under NRS 42.001(4) or because of a failure of proof on the element of conscious disregard. Because the reasoning in the decision is opaque, Maduike is not instructive in analyzing conscious disregard for purposes of implied malice or oppression.

 106 Nev. 54, 57, 787 P.2d 765, 767 (1990).

See Filice, 90 Nev. at 315, 526 P.2d at 89.

Because of Countrywide’s failure to produce perhaps the best evidence to exonerate it of punitive damage liability in this case, the district court permitted the jury to infer that the lost e-mail and the unidentified person’s testimony would have been unfavorable to Countrywide had this evidence been produced. See Bass-Davis v. Davis, 122 Nev. 442, 451-53, 134 P.3d 103, 109-10 (2006).

Countrywide characterizes this case as a convergence of undetected mistakes and therefore contends that there was insufficient evidence that it acted with “an actual knowledge, equivalent to the intent to cause harm.” The intent to cause harm, however, is the mental element of express malice and plays no role in analyzing a defendant’s conscious disregard for purposes of implied malice or oppression. Moreover, to the extent that Countrywide asserts that NRS 42.001(1)’s definition of conscious disregard requires direct proof of a defendant’s actual knowledge, we disagree, since NRS 42.001 does not impose such a specific evidentiary requirement.

 While the Thitcheners’ negligence claim addresses Countrywide’s initial data entry error and repeated failures to discover it, since punitive damages on a theory of implied malice or oppression is a remedy that punishes a culpable cognitive state, the Thitcheners’ request for punitive damages targets Countrywide’s apparent willful and deliberate failure to act appropriately to avoid the probable harmful consequences of foreclosing on the wrong property.

 Notably, at least one other jurisdiction requiring a mental state approximating conscious disregard has recently upheld a punitive damage award under roughly similar circumstances. In Mahana v. Onyx Acceptance Corp., the plaintiff sued a prior lienholder for conversion and sought punitive damages for the wrongful repossession of his truck. 96 P.3d 893 (Utah 2004). There, the lienholder ordered the repossession even though it knew that another lien existed with greater priority, did not investigate the chain of title, mailed a notice of repossession and intent to sell to the debtor’s last mailing address (even though it knew the debtor no longer lived there), and had no internal policy governing this type of situation despite conducting a sizable business in automobile loans. Based on the above, the Utah Supreme Court concluded that there was sufficient evidence that the lienholder knowingly disregarded the plaintiff’s rights. Id. (construing Utah Code Ann. § 78-18-l(l)(a) (2004), which allows for punitive damages on clear and convincing evidence that a tortfeasor’s actions resulted from “conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others”).

 122 Nev. 556, 582-83, 138 P.3d 433, 451-52 (2006).

 114 Nev. 602, 610, 958 P.2d 1208, 1214 (1998).

Id. at 610-11, 958 P.2d at 1214.
In the instant underlying action, the district court instructed the jury as follows:
Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal or a managerial agent authorized the doing and the manner of the act, or (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.

See, e.g., Senate Daily Journal, 68th Leg. 18 (Nev., June 2, 1995) (comments of Senator Mark A. James); Hearing on S.B. 474 Before Senate Comm, on Judiciary, 68th Leg. (Nev., May 18, 1995) (noting the testimony of the Nevada Resort Association’s representative, indicating that the thrust of the bill is to “eliminate vicarious liability for punitive damages” by requiring “deliberate, i.e,, knowing conduct [on behalf of employers]”).

Id.

 114 Nev. at 610-11, 958 P.2d at 1214. The approach is a conservative one because it narrows the scope of vicarious liability for punitive damages by abandoning the use of traditional respondeat superior principles. See 2 J. Kircher & C. Wiseman, Punitive Damages: Law and Practice § 24:1, at 2-5 (2000).

 In doing so, however, we strictly construe NRS 42.007 and thus make no determination with respect to whether NRS 42.007 abrogates the complicity rule as it may apply to agency relationships outside of the employer-employee context. See West Indies v. First Nat. Bank, 67 Nev. 13, 33, 214 P.2d 144, 154 (1950) (“Statutes in derogation of the common law are to be strictly construed.”).

 NRCP 61 (errors not affecting the parties’ substantial rights are harmless and must be disregarded); Insurance Co. of the West v. Gibson Tile, 122 Nev 455, 463, 134 P.3d 698, 703 (2006) (“If an instruction is erroneous, it must also constitute prejudicial error for reversal to be warranted.”).

 Bellegarde, 114 Nev. at 611, 958 P.2d at 1214 (internal quotation marks omitted).

 See Nittinger v. Holman, 119 Nev. 192, 198, 69 P.3d 688, 692 (2003).

 See id.

 106 Nev. 568, 569-70, 796 P.2d 592, 593-94 (1990).

 See Nelson v. Heer, 123 Nev. 217, 222, 163 P.3d 420, 424 (2007) (a district court may grant an NRCP 50(a) motion if a “claim cannot be maintained under the controlling law”).

NRS 42.005(l)(a).

We have carefully reviewed the parties’ separate arguments regarding pre- and post-judgment interest and determine that each argument lacks merit. Accordingly, pre- and post-judgment interest on remand should be recalculated in light of the reductions to the Thitcheners’ overall compensatory damage award at the same 8.25-percent rate as specified in the district court’s original judgment.